IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GIOVANNA REICHARD,                    :
                                      :
                    Plaintiff,        :         CIVIL ACTION NO. 17-2885
                                      :
        v.                            :
                                      :
UNITED OF OMAHA LIFE INSURANCE        :
COMPANY,                              :
                                      :
                    Defendant.        :

## MEMORANDUM OPINION

Smith, J.                                                    August 13, 2018

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, provides protections for employees participating in their employer's benefits plans. Based upon her diagnoses of Crohn's disease and related gastrointestinal and arthritic conditions, the plaintiff employee received both short-term disability and long-term disability benefits under her employer's respective plans. The claims administrator later terminated her long-term disability benefits after the disability definition under the plan changed from merely requiring an inability to perform her own regular occupation to an inability to perform *any* gainful occupation. After the claims administrator denied her appeal of the termination of benefits, the plaintiff filed the instant ERISA action against the administrator.

Currently before the court are the parties' cross-motions for summary judgment, as well as the plaintiff's alternative motion pursuant to Federal Rule of Civil Procedure 52, on the issue of whether the termination of long-term disability benefits was arbitrary and capricious. As explained below, the court finds that there are no genuine issues of material fact and that the claims administrator's decision to terminate the plaintiff's long-term disability benefits was not

without reason, unsupported by substantial evidence, or erroneous as a matter of law. Accordingly, the court will grant the claims administrator's motion for summary judgment and deny the plaintiff employee's motion for summary judgment, as well as her alternative motion.

## I.    PROCEDURAL HISTORY

The plaintiff, Giovanna Reichard ("Reichard"), commenced this ERISA action by filing a complaint against the originally-named defendant, Mutual of Omaha Life Insurance Company, on June 27, 2017. Doc. No. 1. Reichard soon filed an amended complaint on July 13, 2017, naming only United of Omaha Life Insurance Company ("United of Omaha") and effectively terminating Mutual of Omaha Life Insurance Company as a defendant. Doc. No. 2. In the amended complaint, Reichard alleges that, pursuant to 29 U.S.C. § 1132(a)(1), United of Omaha's decision to terminate her long-term disability ("LTD") benefits was arbitrary and capricious. Am. Compl. at ¶¶ 1, 27. United of Omaha filed an answer to the amended complaint on August 10, 2018, and the court held an initial pretrial conference with counsel for the parties on October 4, 2017. Doc. Nos. 7, 11.

During discovery, Reichard filed a motion to compel United of Omaha to produce conflict of interest discovery concerning Dr. Thomas Reeder ("Dr. Reeder"), the sole medical reviewer of Reichard's United of Omaha appeal. *See* Mem. P. & A. Supp. Pl.'s Mot. Compel Disc. at 1–2, Doc. No. 27. Specifically, Reichard sought Dr. Reeder's "batting average"—*i.e.* the proportion of claims in which Dr. Reeder, as the sole medical reviewer for United of Omaha on appeal, concluded that a claimant had work capacity. *See id.*; Def. United of Omaha Life Ins. Co.'s Br. Opp'n Pl.'s Mot. Compel Disc. at 1, Doc. No. 29. United of Omaha filed a response in opposition to the motion to compel on February 9, 2018. Doc. No. 29. Reichard then filed a

reply to the response on February 16, 2018. Doc. No. 30. The court heard oral argument and denied the motion to compel on February 20, 2018. Doc. Nos. 31, 32.

After an unsuccessful settlement conference, the parties jointly filed the complete administrative record in this case on April 5, 2018. Doc. Nos. 37, 40. The parties filed cross-motions for summary judgment, accompanied by statements of undisputed material facts and briefs in support of their motions, on May 11, 2018. Doc. Nos. 41, 42. Reichard also alternatively moved for judgment pursuant to Federal Rule of Civil Procedure 52 in her summary judgment motion. Doc. No. 42. The parties then filed responses to the motions on June 1, 2018, and United of Omaha filed a reply to Reichard's response on June 11, 2018. Doc. Nos. 43–46. The court heard oral argument on the cross-motions for summary judgment on June 21, 2018, which are now ripe for disposition.

## II. APPLICABLE RECORD[1]

Reichard worked as a registered nurse for Coordinated Health from 2010 to 2014. Pl.'s Statement Undisputed Material Facts Supp. Pl.'s Mot. Summ. J. ("Pl.'s Facts") at ¶ 1, Doc. No. 42-1; Def. United of Omaha Life Ins. Co.'s Resp. Opp'n Pl.'s Mot. Summ. J./Mot. J. and Statement Undisputed Material Facts Related Thereto ("Def.'s Resp.") at ¶ 1, Doc. No. 45; Administrative R. ("Admin. R.") at 511.[2] Coordinated Health maintained a Group Voluntary Long-Term Disability Plan (the "Plan") for its employees. Def. United of Omaha Life Ins. Co.'s

---

[1] The court commends the parties for their compilation of the record in this matter and their legal submissions. Nonetheless, the undersigned's policies and procedures pertaining to motions for summary judgment require that parties refrain from legal arguments in their statements of undisputed material facts. In addition, the responses to a party's statements of undisputed material facts should not contain legal arguments. While it had no bearing on the ultimate outcome of the cross-motions in this case, the parties' combination of factual statements with argument rendered review of the purportedly undisputed facts and responses thereto more burdensome than necessary. Most notably, Reichard copied and pasted variations of the same two-page legal argument over a dozen times in her response to United of Omaha's statement of undisputed material facts.

[2] Although the term "UNITED" and a string of zeros precede each page number in the administrative record, the court has removed these repetitive characters in the interest of brevity. For example, the court cites "UNITED-000511" simply as 511.

Mot. Summ. J. and Statement Undisputed Material Facts Fed. R. Civ. P. 56 ("Def.'s Facts") at ¶¶ 4, 17, Doc. No. 41; Pl.'s Opp'n Def. United of Omaha Life Ins. Co.'s Statement Undisputed Material Facts ("Pl.'s Resp.") at ¶¶ 4, 17, Doc. No. 44; Admin. R. at 173. The Plan included long-term disability ("LTD") benefits provided through an insurance policy issued by United of Omaha (the "Policy"). Def.'s Facts at ¶ 19; Pl.'s Resp. at ¶ 19; Pl.'s Facts at ¶¶ 2–3; Def.'s Resp. at ¶¶ 2–3. Reichard was a participant in the Plan, entitling her to LTD benefits if she met certain criteria. Def.'s Facts at ¶¶ 18–19; Pl's. Resp. at ¶¶ 18–19. Coordinated Health also provided short-term disability ("STD") benefits for its employees under an insurance policy issued by United of Omaha. Def.'s Facts at ¶ 20; Pl.'s Resp. at ¶ 20.

The following factual summary details: (1) the applicable provisions of the Policy; (2) Reichard's applications for STD and LTD benefits; (3) her receipt of benefits and submission of supplementary reports of disability; (4) United of Omaha's medical and vocational examinations and reviews; (5) United of Omaha's termination of Reichard's LTD benefits; (6) her appeal correspondence; (7) Dr. Reeder's medical file review on appeal, including a discussion of Reichard's treatment records dating back to 2014; (8) Dr. Reeder's correspondence with Reichard's doctors; (9) United of Omaha's denial of Reichard's appeal; and (10) her Social Security disability ("SSD") claim.

### A.     Applicable Provisions Of The Policy

According to the Policy, if a Plan participant becomes "Disabled," United of Omaha agrees to pay a "Monthly Benefit" beginning after an "Elimination Period." Def.'s Facts at ¶ 24; Pl.'s Resp. at ¶ 24; Admin. R. at 188, 200. The amount of the "Monthly Benefit" is the lesser of $5,000 or 60% of monthly earnings. Admin. R. at 178, 180. The "Elimination Period" is the later of 90 calendar days or the end-date of STD benefits. Def.'s Facts at ¶ 25; Pl.'s Resp. at ¶

4

25; Admin. R. at 178–79. The term "Disabled" encompasses three separate definitions for "during the Elimination Period," "after the Elimination Period," and "after a Monthly Benefit has been paid for 2 years;" the Policy states that "Disabled" means that

> because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
>
> a) during the Elimination Period, You are prevented from performing at least one of the Material Duties[3] of Your Regular Occupation[4] on a part-time or full-time basis; and
>
> b) after the Elimination Period, You are:
>
>     1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>
>     2. unable to generate Current Earnings which exceed 80% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 2 years, . . . *Disabled* mean[s] You are unable to perform all of the Material Duties of any Gainful Occupation.[5]
>
> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

Def.'s Facts at ¶ 27; Pl.'s Resp. at ¶ 27; Admin. R. at 198–99 (emphasis in original). Thus, the definition of "Disabled" "after the Elimination Period" adds a requirement of an inability to generate more than 80% of monthly earnings; and more stringent still, the definition of

---

[3] "Material Duties" means

> the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

Def.'s Facts at ¶ 29; Pl.'s Resp. at ¶ 29; Admin. R. at 199.

[4] "Regular Occupation" means

> the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). . . . To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

Def.'s Facts at ¶ 30; Pl.'s Resp. at ¶ 30; Admin. R. at 201.

[5] "Gainful Occupation" means

> an occupation for which You are reasonably fitted by training, education, or experience, and provides or can be expected to provide You with Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to work.

Def.'s Facts at ¶ 28; Pl.'s Resp. at ¶ 28; Admin. R. at 199.

"Disabled" "[a]fter a Monthly Benefit has been paid for 2 years" adds the requirement that the participant cannot perform not just her own Regular Occupation, but "*any* Gainful Occupation."[6] Admin. R. at 198-99 (emphasis added).

The Policy provides instructions for filing a claim for disability benefits and entitles a claimant to notice of and reasons supporting a claim denial, "a reasonable opportunity to appeal a claim review decision," and "a full and fair review of the claim review decision."[7] Pl.'s Facts at ¶ 6; Def.'s Resp. at ¶ 6; Admin. R. at 193–96. Finally, the Policy offers assistance to claimants receiving Monthly Benefits with filing for SSD benefits, including helping them find "appropriate representation." Pl.'s Facts at ¶ 6; Def.'s Resp. at ¶ 6; Admin. R. at 182–83.

## B. Reichard's Applications For STD And LTD Benefits

Reichard submitted a STD benefits claim to United of Omaha on April 24, 2014, one day after she contacted her physician to notify him of a "Crohn's attack." Pl.'s Facts at ¶ 7; Def.'s Resp. at ¶ 7; Admin. R. at 116, 146. On the claim form, she listed Crohn's, nausea, depressed appetite, and epigastric pain as illnesses and symptoms; a first treatment date of March 19, 2014; and a disability date of April 24, 2014. Pl.'s Facts at ¶ 7; Def.'s Resp. at ¶ 7; Admin. R. at 116, 146. Dr. Mark Osterman, Reichard's gastroenterologist, submitted an attending physician statement ("APS") dated May 12, 2014, in connection with the STD claim. Admin R. at 119–20. He indicated that Reichard could lift and carry up to ten pounds frequently and 11 to 50 pounds

---

[6] In its brief, United of Omaha takes advantage of an ambiguity to the word "all" in the "Disabled" definition "[a]fter a Monthly Benefit has been paid for 2 years" by arguing the following interpretation: If a claimant could perform at least one Material Duty of any Gainful Occupation, she is unentitled to LTD benefits. At oral argument, United of Omaha stated it was no longer pursuing that argument. To the extent there is any ambiguity to the definition, the court resolves it against United of Omaha's initial interpretation because such a strict definition would disqualify virtually every claimant. The definition means the following: If a claimant cannot perform at least one Material Duty of any Gainful Occupation, she is entitled to LTD benefits.

[7] As an aside relating to its claims procedures, United of Omaha "has not utilized a claims manual for the last 5 years," as it explained in an interrogatory response. Pl.'s Facts at ¶ 90; Def.'s Resp. at ¶ 90. As discussed in Part III.B.1.a., *infra*, this fact is outside of the administrative record, and the court only includes it here to provide context for Reichard's argument discussed in Part III.B.1.a.

occasionally; could sit, stand, and walk continuously for six to eight hours; and should be able to return to work full-time in six months. *Id.* In an accompanying Family Medical Leave Act form, he stated that "direct patient care" was the sole job function Reichard was unable to perform. Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45; Admin. R. at 132–33. He explained that Reichard suffered from abdominal and epigastric pain, decreased appetite, fatigue, nausea, multiple trips to the bathroom, joint pain in the hips and knees, and unpredictable and episodic flare-ups that would prevent her from performing her job functions. Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45; Admin. R. at 133–34.

United of Omaha denied Reichard's STD claim on May 27, 2014, as well as her appeal of that denial on August 12, 2014. Pl.'s Facts at ¶¶ 9, 11; Def.'s Resp. at ¶¶ 9, 11; Admin. R. at 49–52, 145–48. Although United of Omaha had already denied Reichard's STD claim, Dr. Nicole Chiappetta, Reichard's rheumatologist and primary care physician, wrote a letter dated May 29, 2014, on her behalf, stating:

> I have been following Giovanna for a history of arthritis of inflammatory bowel disease associated with Crohn's disease. This arthritis is affecting primarily her bilateral knees, and she does also have radiographic evidence of secondary osteoarthritis. I believe this is contributing primarily to her overall pain. Intraarticular cortisone injections have been administered in the past, as well as viscosupplementation injections, all with minimal relief. She unfortunately cannot take NSAIDs due to her bowel disease. Unfortunately, her job requires her to stand for prolonged periods of time and to move from sitting, standing, and squatting positions during the day. Her severe pain due to both arthritis of inflammatory bowel disease and secondary osteoarthritis inhibits this, therefore I do not believe she can perform her trained duties at this time and is disabled.

Pl.'s Facts at ¶ 47; Def.'s Resp. at ¶ 47; Admin. R. at 135.

Reichard next submitted a LTD benefits claim on August 29, 2014. Admin. R. at 38–48. As in her STD claim, she listed a disability date of April 24, 2014. Def.'s Facts at ¶ 36; Pl.'s Resp. at ¶ 36; Admin. R. at 40. She stated she was unable to work because of her Crohn's

disease, bilateral knee pain, and right hip pain. Def.'s Facts at ¶ 35; Pl.'s Resp. at ¶ 35; Admin. R. at 40. She identified Dr. Osterman and Dr. Chiappetta as the two doctors for whom she sought treatment for her conditions. Def.'s Facts at ¶ 38; Pl.'s Resp. at ¶ 38; Admin. R. at 41.

Dr. Chiappetta submitted an APS in support of Reichard's LTD claim, listing: knee pain and trochanteric bursitis as primary diagnoses; knee and hip pain as symptoms; "focal tenderness over troch[anteric] bursa and pain with flexion and extension of the knee" as objective findings; Crohn's disease as a "secondary" disabling condition; Humira as a prescribed medication; and viscosupplementation, cortisone injections, and physical therapy as treatment. Def.'s Facts at ¶¶ 42–47; Pl.'s Resp. at ¶¶ 42–47; Admin. R. at 45–47. Concerning Reichard's work ability, Dr. Chiappetta opined that she should not do any heavy lifting or climbing due to severe pain in bilateral knees; could not stand for more than a half hour continually or squat; has chronic arthritis in both knees that will not improve; in an eight-hour workday, could sit for six hours, stand for one hour, and walk for two hours; and was restricted in lifting or carrying more than 20 pounds, squatting for more than 20 minutes continuously, and climbing high heights due to knee pain. Def.'s Facts at ¶¶ 48–49; Pl.'s Resp. at ¶¶ 48–49; Admin. R. at 46. In terms of functions of Reichard's occupation that she could not perform, Dr. Chiappetta wrote that she was unable to stand for more than 20 minutes at a time and would need frequent breaks. Def.'s Facts at ¶ 50; Pl.'s Resp. at ¶ 50; Admin. R. at 47. Dr. Chiappetta also explained that there were "[n]o specific functional restrictions other than what w[ere] mentioned prior" in the claim form. Def.'s Facts at ¶ 51; Pl.'s Resp. at ¶ 51; Admin. R. at 47. Nevertheless, Dr. Chiappetta did not expect Reichard to ever return to her prior level of functioning, never expected fundamental changes in her medical condition, and concluded that she could not work "[d]ue to her professional training." Admin. R. at 46–47.

### C.     Reichard's Receipt Of Benefits And Submission of Supplementary Reports of Disability

United of Omaha granted LTD benefits on November 4, 2014, effective July 24, 2014, and retroactive STD benefits on February 23, 2015, effective for the 11-week period from May 8, 2014, to July 23, 2014. Def.'s Facts at ¶¶ 53, 56, 57; Pl.'s Resp. at ¶¶ 53, 56, 57; Pl.'s Facts at ¶¶ 13, 14; Def.'s Resp. at ¶¶ 13, 14; Admin. R. at 34–35, 166, 1114–16. United of Omaha's approval letter explained that after 24 months of LTD benefits, on July 24, 2016, the definition of "Disability" under the Policy would change; to continue receiving benefits she would have to be unable to "perform all material duties of any gainful occupation," not just her own regular occupation. Def.'s Facts at ¶ 54; Pl.'s Resp. at ¶ 54; Admin. R. at 1114.

Reichard submitted two supplementary reports of disability ("SRD") after United of Omaha granted her LTD benefits. In the first SRD, dated June 20, 2015, she explained, "My daily activities have not changed from my last report. My activities are dependent on my pain in my joints and my Crohn's disease." Def.'s Facts at ¶ 58; Pl.'s Resp. at ¶ 58; Admin. R. at 993. That same day, she also submitted a health questionnaire listing the following medications taken since the beginning of 2015: Humira, Methotrexate, Zanaflex, folic acid, Lyrica, Ambien, vitamins D and B12, Dexilant, Ranitidine HCL, Percocet, Zofran, Lomotil, and Levsin SL. Pl.'s Facts at ¶ 16; Def.'s Resp. at ¶ 16; Admin. R. at 995–96.

Dr. Chiappetta also submitted another APS on July 7, 2015, in connection with the June 20, 2015 SRD. Def.'s Facts at ¶ 59; Pl.'s Resp. at ¶ 59; Admin. R. at 994. This APS, Dr. Chiappetta's second, varied in several respects from the APS submitted in support of Reichard's initial LTD claim in August 2014. Dr. Chiappetta now listed Crohn's disease as a primary, not secondary, diagnosis; omitted trochanteric bursitis as a primary diagnosis; added shoulder pain and depression as primary diagnoses and objective findings; opined that in an eight-hour

workday Reichard could now stand for two hours, as opposed to one, but only walk for one hour, as opposed to two, and could still sit for six hours; opined that Reichard had no restrictions in lifting or carrying, an improvement over the prior 20-pound restriction; included a new crawling restriction; suggested that Reichard's medical prognosis for recovery was fair; and described Reichard's knee arthritis as "severe." Def.'s Facts at ¶ 59; Pl.'s Resp. at ¶ 59; Admin R. at 45–46, 994. Both APSs reference knee pain as a primary diagnosis, squatting and climbing limitations, and a conclusion that Reichard had not "achieved maximum medical improvement." *Id.*

At the request of United of Omaha, Reichard submitted a second SRD and health questionnaire on February 2, 2016. Pl.'s Facts at ¶¶ 18, 19; Def.'s Resp. at ¶¶ 18, 19; Admin. R. at 884, 892. In the Report, she again wrote, "My activities have not changed since my last report. My activities are dependent on my pain in my joints and my Crohn's disease." Pl.'s Facts at ¶ 19; Def.'s Resp. at ¶ 19; Admin. R. at 884. On the accompanying health questionnaire, Reichard listed many of the same medications as she had on the June 20, 2015 health questionnaire: Humira, Methotrexate, Zanaflex, folic acid, Lyrica, Ambien, vitamins D and B12, Percocet, Zofran, and Levsin SL. She omitted Dexilant, Ranitidine HCL, and Lomotil; she added Prevacid, Naproxen, Keflex, and one other illegible medication. Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21; Admin. R. at 889–90.

Dr. Chiappetta again submitted an APS in connection with the February 2, 2016 SRD. Pl.'s Facts at ¶ 20; Def.'s Resp. at ¶ 20; Admin. R. at 446. Compared to Dr. Chiappetta's prior statement, she added depression, elevated liver function, vitamin D deficiency, and polyarthropathy as primary diagnoses; downgraded Reichard's prognosis for medical recovery to "poor;" opined that, in an eight-hour workday, Reichard could now sit for eight hours (increased

from six hours), stand for one hour (decreased from two hours), and walk for one hour (unchanged); and added depression as a psychological restriction. Admin. R. at 446, 994. Rather than check "yes" or "no" for various types of physical restrictions, as she had previously, Dr. Chiappetta simply double underlined "no work" in the section for comments on restrictions. *Id.*

United of Omaha then sent Reichard a letter on February 16, 2016, that again explained that the Policy's definition of "Disability" would change on July 24, 2016. Def.'s Facts at ¶ 62; Pl.'s Resp. at ¶ 62; Admin. R. at 876–77. The letter explained:

> We are currently reviewing your claim to determine if you meet the policy definition of Disability based upon inability to perform all of the Material Duties of any Gainful Occupation beyond July 24, 2016. We may be contacting your doctor(s) for updated medical reports and information regarding your restrictions and limitations.

Admin. R. at 877.

### D. United Of Omaha's Medical And Vocational Examinations And Reviews

Following the transition to the "any Gainful Occupation" definition of "Disability" on July 24, 2016, United of Omaha arranged several examinations and reviews relating to Reichard's LTD claim during the latter half of 2016: (1) a nurse referral review by United of Omaha Nurse Julie Grancer ("Nurse Grancer") from June 2016; (2) a transferable skills assessment ("TSA") by vocational rehabilitation consultant Douglas Palmer ("Palmer") from August 2016; (3) a medical peer review by Dr. Thomas Liebermann dated October 3, 2016; and (4) an independent medical examination ("IME") by Dr. Steven Golombek resulting in a report dated November 11, 2016. Pl.'s Facts at ¶¶ 23–26; Def.'s Resp. at ¶¶ 23–26; Def.'s Facts at ¶ 65; Pl.'s Resp. at ¶ 65; Admin. R. at 442–44, 513–19, 557–60, 547–52. The court discusses each report in turn.

### 1.    June 2016 Nurse Referral Review by Nurse Grancer

In conducting her review of Reichard's LTD benefits claim, Nurse Grancer reviewed the records in United of Omaha's claim file, including: (1) a description of Reichard's job; (2) her education, training, and work experience; (3) medical reviews from October 2014; (4) neurology progress notes by Physician Assistant Courtney Bloss from September 2015 and January 2016; (5) progress notes from Reichard's orthopedic surgeon, Dr. Wayne Luchetti, from October 2015 and December 2015; (6) progress notes by Dr. Chiappetta from December 2015 and February 2016; (7) laboratory results from December 2015 and February 2016; (8) an ultrasound of Reichard's abdomen from December 2015; (9) a rehabilitation discharge summary from December 2015; and (10) Dr. Chiappetta's February 2016 Attending Physician's Statement.[8] Def.'s Facts at ¶ 66; Pl.'s Resp. at ¶ 66; Admin. R. at 514.

Nurse Grancer noted the same diagnoses from Dr. Chiappetta's February 2016 APS: "Crohn's disease (chronic bowel inflammation), depression, elevated liver enzymes, vitamin [D] deficiency[,] and polyarthropathy (arthritis that involve[s five] or more joints simultaneously and usually associated with autoimmune conditions)." Def.'s Facts at ¶ 66; Pl.'s Resp. at ¶ 66; Admin. R. at 446, 513. Additionally, she noted a history of "tobacco use, ulcerative colitis, rheumatoid arthritis, fibromyalgia, insomnia, neck pain, migraines[,] and [a] stable lesion of the pituitary gland;" and treatments including a surgical bowel resection in January 2012, cervical fusion in 2009, Synvisc injections in both knees, and a knee replacement in October 2014. Def.'s Facts at ¶ 67; Pl.'s Resp. at ¶ 67; Admin. R. at 514.

Nurse Grancer reached several conclusions in her medical analysis. First, the records suggested that Reichard's Crohn's disease had "remained stable with occasional bouts of diarrhea," and that she had "maintained normal weight and nutritional status." Admin. R. at 516.

---

[8] The court summarizes many of these records and others in Section II.G., *infra*.

She also noted elevated white blood counts related to steroids and a recent suggestion that Reichard would start taking Methotrexate. *Id.* Second, she found "no evidence in the records assessed to indicate a degree of depression that warrants any type of functional impairment." *Id.* Third, her vitamin D deficiency was not functionally limiting. *Id.* Fourth, exams did not demonstrate deficits associated with headaches, and they occurred one to three days per month. *Id.* Fifth, although she complained of right hip pain, her records contained no right hip imaging studies. *Id.* Sixth, she addressed the status of Reichard's knees:

> She's status post left knee unicompartmental knee replacement from 2014. On 10/06/15 x-ray of the left knee demonstrates prosthesis in place in proper anatomical alignment without rotation, loosening[,] or stress shielding. Orthopedic evaluation on 12/22/15 indicated the [claimant] did a lot of shopping the other day[,] and her left knee was sore. Exam of the left knee demonstrates no visible abnormalities and intact [range of motion]. Neurology provides normal exams with intact unaided gait, normal 5/5 strength throughout, normal reflexes and coordination, and intact sensation.

*Id.* at 516–17. Finally, Nurse Grancer assessed Reichard's restrictions and limitations as follows:

> No lifting/carrying > 20 pounds[; u]nlimited sitting with the ability to reposition as needed and stand/walk every 1-2 hours for 5-10 minutes[; n]o prolonged standing/walking > 1-2 hours[,] then would require the ability to reposition or sit down 10 minutes prior to standing/walking again[; n]o running, jumping, full squatting, crawling, climbing ladders, balancing or use of the left lower extremity as in operating forceful foot controls[; m]ay occasionally bend, crouch[,] and kneel[; u]nlimited use of the upper extremities in fine motor activity, pinching gripping, grasping, reaching forward[,] and keyboarding[; n]o constant overhead reaching[; and n]o exposure to large vibratory machinery[.]

*Id.* at 517.

The following month, on July 5, 2016, Reichard emailed United of Omaha challenging, *inter alia*, Nurse Grancer's omission of doctors listed on her most recent health questionnaire, including Dr. Osterman; the conclusion that her Crohn's disease was "stable;" and the omission of her most recent medications. Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22; Def.'s Facts at ¶ 72; Pl.'s Resp. at ¶ 72; Admin. R. at 605–08.

## 2. August 2016 TSA by Palmer

United of Omaha referred Reichard's claim to Palmer in August 2016 for him to evaluate her transferable skills. Def.'s Facts at ¶¶ 73, 74; Pl.'s Resp. at ¶¶ 73, 74; Admin. R. at 442. Based on information provided by United of Omaha, Palmer specifically evaluated whether Reichard's condition permitted her to work within the sedentary[9] and light[10] Dictionary of Occupational Titles ("DOT") levels of activity. Def.'s Facts at ¶ 75; Pl.'s Resp. at ¶ 75; Admin. R. at 442. Specifically, United of Omaha provided Palmer with a referral note detailing functional abilities; an education, training, and work experience form; and Reichard's job description. Admin R. at 442. In his analysis of Reichard's functional abilities, he relays the same diagnoses, restrictions, limitations, and abilities from Nurse Grancer's review. *See id.* at 442, 446, 513, 517.

Palmer ultimately concluded that Reichard "would currently qualify for employment in other occupations." *Id.* at 443. He listed examples of viable employment options along with DOT reference numbers, exertional demand levels, and monthly wages. *Id.* at 444. The list contained five jobs: office nurse, school nurse, medical insurance clerk, hospital-admitting clerk, and administrative clerk. *Id.* In support of his conclusions, he explained:

> According to the Guide for Occupational Explorations . . . , the Claimant's extensive work experience in nursing patient care . . . , laboratory science . . . ,

---

[9] Palmer indicated that "sedentary" work, as defined by the DOT, is

> exerting up to 10 lbs. of force occasionally and a negligible amount of force frequently to lift, carry, push or otherwise move objects. Sitting is required frequently to constantly with occasional or intermittent standing/walking. This category typically includes requirements for near visual acuity and repetitive, bilateral fine finger and hand movements.

Admin. R. at 442–43.

[10] Palmer indicated that "light" work, as defined by the DOT, is

> exerting up to 20 lbs. of force occasionally, and/or up to 10 lbs. frequently, and/or a negligible amount of force constantly to lift, carry, push, pull, or otherwise move objects. Even though the amount of force may be negligible, a job should be rated in this category if[:] (1) it requires standing or walking to a significant degree, OR (2) it requires sitting most of the time but entails pushing, pulling or manipulating of arm or leg controls, OR (3) it requires work at a production rate/pace entailing constant pushing, pulling of materials of negligible weight[.]

Admin. R. at 443.

and business administration support . . . would suggest she can apply technical knowledge, common sense, and special medical skills to car[e] for or treat sick or handicapped people; she can adapt to emergency situations; she can instruct, plan[,] or direct the work of others; she can follow technical instructions; she can record data and obtain and safeguard confidential information on individuals; she can speak distinctly when dealing with people in various situations; and she can make decisions involving company policy.

. . . .

. . . Based upon review of the information provided and research performed by this Consultant, the Claimant currently qualifies for work in other occupations; she resides within a viable labor market where alternate occupations exist; occupations are able to be identified that are comparable with her current work capacity; and she qualifies for work that would be expected to provide a wage meeting or exceeding the gainful threshold . . . .

Def.'s Facts at ¶ 77; Pl.'s Resp. at ¶ 77; Admin. R. at 443–44.

### 3. October 2016 Peer Review by Dr. Liebermann

United of Omaha next retained Dr. Liebermann to conduct a peer review of Reichard's records. Def.'s Facts at ¶¶ 79, 80; Pl.'s Resp. at ¶¶ 79, 80; Admin. R. at 230–33, 572–73. In preparing for his report, Dr. Liebermann reviewed: (1) all APSs; (2) medical records, correspondence, and consultations from 2014 through 2016; diagnostics; (3) labs; (4) medications; (5) United of Omaha's internal claim review notes and interviews; (6) occupational information; (7) employee and employer statements; and (8) an authorization. Admin. R. at 231. While noting that Reichard's primary medical issues were Crohn's disease and "multiple rheumatologic issues," Dr. Liebermann, board-certified in gastroenterology and internal medicine, deferred to an appropriate specialist on her rheumatological care. Pl.'s Facts at ¶ 25A; Def.'s Resp. at ¶ 25A; Admin. R. at 230, 232.

Dr. Liebermann summarized Reichard's gastrointestinal medical history as follows:

She has a history of inflammatory bowel disease since the age of 8. Her disease was initially characterized as ulcerative colitis. In 2012 she was seen at the University of Pennsylvania where a diagnosis of Crohn's colitis was made. In January of 2012 the claimant had 18 inches of distal small bowel removed with the right side of the colon. The claimant took Imuran for 20 years. Since

> 4/24/2014 going forward the claimant has experienced occasional bouts of abdominal pain and diarrhea while maintaining normal weight and nutritional status. She has a history of the arthropathy of inflammatory bowel disease.
>
> On 12/15/2015 she was found to have elevation of liver enzymes which were further evaluated but the results are not part of the documentation. She has undergone several colonoscopies . . . .

Admin. R. at 231. He concluded his summary by stating that he had "no gastrointestinal medical information as of July 2016 going forward." *Id.*

In addition to summarizing Reichard's gastrointestinal medical history, Dr. Liebermann reaches several conclusions and opinions in his October 3, 2016 report. *See id.* at 230–33. First, he concludes that Reichard "does not have significant problems with Crohn's disease at this time and has not had significant issues since January 2012 . . . ;" therefore, her condition was "stable." Pl.'s Facts at ¶ 25B; Def.'s Resp. at ¶ 25B; Admin. R. at 231–32. He supported this conclusion with a purported comment from Dr. Osterman that Reichard was stable on May 15, 2016, and an opinion that "she has done quite well with only occasional bouts of diarrhea and abdominal pain." Admin. R. at 231–32. He continues, "there has been no concrete evidence of recurrence of Crohn's disease," "[Reichard] is doing well as of 7/1/2016 going forward to the present day from a gastrointestinal standpoint," and "I have no reason to think that she had any new symptoms suggesting a flare of the inflammatory bowel disease." Def.'s Facts at ¶ 84; Pl.'s Resp. at ¶ 84; Admin. R. at 230–31.

Second, and relatedly, he explains, "Although a flare is possible I reserve the opportunity to comment if the claimant has additional symptoms from the July to September 2016 time-frame if additional information is provided." Pl.'s Facts at ¶ 25B; Def.'s Resp. at ¶ 25B; Admin. R. at 230. Third, looking forward, he states that "it is likely that she will remain in remission beyond July 2016" because her condition remained stable "for months." Admin. R. at 232. Finally, he concludes that Reichard "has no restrictions or limitations from a gastrointestinal

standpoint from 7/1/2016 through 10/1/2016" and is not "functionally impaired." Pl.'s Facts at ¶ 25B; Def.'s Resp. at ¶ 25B; Def.'s Facts at ¶¶ 83, 85; Pl.'s Resp. at ¶¶ 83, 85; Admin. R. at 230, 232.

### 4. November 2016 IME by Dr. Golombek

Dr. Golombek, a board-certified rheumatologist, conducted an IME of Reichard at the request of United of Omaha on November 1, 2016. Def.'s Facts at ¶ 86; Pl.'s Resp. at ¶ 86; Admin. R. at 234, 561–62. He then sent a report of his IME to United of Omaha on November 11, 2016. Def.'s Facts at ¶ 87; Pl.'s Resp. at ¶ 87; Admin. R. at 234–39. In addition to physically examining and interviewing Reichard, Dr. Golombek noted in his report that he reviewed various medical records: (1) knee MRIs; progress notes from "Dr. Mark Listerman [sic]," "Dr. Nicole Chiapteta [sic]," and Dr. Mandelker; (2) operative records from Dr. Luchetti; (3) a gynecology evaluation by "Dr. Ravenelle [sic];" (4) physical therapy evaluations by Mario Carranza; and (5) a vocational evaluation by "Ms. Almer [sic]." Pl.'s Facts at ¶¶ 26A–C; Def.'s Resp. at ¶¶ 26A–C; Def.'s Facts at ¶ 88; Pl.'s Resp. at ¶ 88; Admin. R. at 234–35. While no records appear to exist for each of the quoted individuals above, Reichard did receive treatment from Dr. Mark Osterman, Dr. Nicole Chiappetta, and a nurse practitioner named Ravenelle. *See* Pl.'s Facts at ¶¶ 26A–B; Def.'s Resp. at ¶¶ 26A–B; Pl.'s Resp. at ¶ 88. Additionally, as discussed above, Palmer, not "Ms. Almer," conducted a vocational evaluation. *See* Pl.'s Facts at ¶ 26C; Def.'s Resp. at ¶ 26C; Pl.'s Resp. at ¶ 88.

Before discussing his conclusions, Dr. Golombek summarized Reichard's individual and medical history, current medical complaints, and the results of his physical examination. Admin. R. at 235–36. Concerning Reichard's medical history, Dr. Golombek noted a history of Crohn's disease and joint pain, as well as fibromyalgia for the previous five years. *Id.* at 236. He wrote

that her Crohn's disease "is manifested by frequent bowel movements and bleeding." *Id.* at 235. He then listed Reichard's medications and dosages and noted that she recently had started taking Prednisone; although it helped her joint pain, her gastroenterologist preferred that she not take it. *Id.* at 236. He considered her fibromyalgia "stable" and noted that she sleeps "on and off for about three hours at a time" and "has daily headaches." *Id.* Lyrica helped her fibromyalgia symptoms, according to her. *Id.* at 239.

Concerning Reichard's current medical complaints, Dr. Golombek stated that she complains of "diffuse joint pains, including the fingers, elbows, hips, ankles[,] and knees." *Id.* at 236. He added, "She also has frequent diarrhea from the Crohn's disease" and described the impact of Crohn's on her work day: "She was unable to eat while she worked because of fear of having to go to the bathroom. She would have about six bowel movements prior to work. As a result of not eating, she felt exhausted with poor energy." *Id.* at 235–36. As a result of these joint pains, her Crohn's disease, and fatigue, Reichard noted to Dr. Golombek that she could not work. Def.'s Facts at ¶ 89; Pl.'s Resp. at ¶ 89; Admin. R. at 235. Concerning the results of his physical examination, Dr. Golombek explained that a joint examination "revealed no evidence of active synovitis," "[a]ll joints had full range of motion and were non-tender to palpation," grip and motor strength in the extremities was normal, and she could ambulate without a problem and sit and transfer without problems. Admin. R. at 236.

From his review of medical records and physical examination of Reichard, Dr. Golombek found that the records support diagnoses of Crohn's disease, resulting polarthralgias, and fibromyalgia. *Id.* at 237. He reported few restrictions and limitations from a rheumatological perspective other than her subjective pain as of July 24, 2016:

> She does not display any physical restrictions based on her joint exam. She has full mobility and strength of her joints. Her restrictions are limited by her

subjective pain. She is able to do all activities that do not cause undue discomfort. She is certainly able to do fine motor activities with her hands. She is able to lift her arms over her shoulders. She is able to grab and carry objects. She is able to walk and sit. I feel that she can sit for six to eight hours daily. She is able to stand one hour continuously without problems. She is able to walk for one hour continuously without problems. She is able to drive. She is able to lift and carry 20 pounds or less. She is able to use her hands repetitively. She is able to use her feet repetitively. She is able to bend. She can do occasional squatting, but not more than 15 minutes continuously. She is able to crawl. She should not be doing climbing. She is able to reach above shoulder level.

. . . .

In reviewing the disability questionnaire of Dr. Chiapteta [sic], I agree that she is able to sit, stand[,] and walk as she notes. . . .

. . . .

She was able to cooperate fully with the exam and get on the exam table and walk without problems. . . .

. . . .

The present findings are consistent with the claimant's reports of full mobility and no restriction of motion. The other complaints are more subjective in nature of joint pain, but there is no objective joint swelling or tenderness that is observed.

Pl.'s Facts at ¶ 26D; Def.'s Resp. at ¶ 26D; Def.'s Facts at ¶¶ 91–93; Pl.'s Resp. at ¶¶ 91-93; Admin. R. at 237–38.

### E.    United Of Omaha's Termination Of Reichard's LTD Benefits

United of Omaha sent Reichard a letter dated December 30, 2016, informing her that it had completed its review of her claim and had decided to deny ongoing LTD benefits. Def.'s Facts at ¶ 94; Pl.'s Resp. at ¶ 94; Admin. R. at 523–31. United of Omaha reached its determination by relying on the same records upon which Nurse Grancer relied in her review, Nurse Grancer's review, prior medical consultant reviews from 2014, Palmer's TSA, Dr. Liebermann's peer review, and Dr. Golombek's IME report. *See* Admin. R. at 514, 524–25. After summarizing these records, the letter concluded that Reichard "would not be restricted from performing a sedentary or light occupation" with noted restrictions and limitations. Def.'s Facts at ¶ 96; Pl.'s Resp. at ¶ 96; Admin. R. at 528. She also explained that Reichard's Gainful

19

Occupational wage was $3,117.91, sixty percent of her pre-disability wage of $5,196.51. Admin. R. at 529. The letter then reproduced Palmer's "list of sample occupations for which you have the transferable skills to perform and would fall within the gainful earnings:"

| Job Titles | DOT # | Physical Demand | Monthly Wage |
|---|---|---|---|
| Office Nurse | 075.374-014 | Light | $4,665.83 |
| School Nurse | 075.124-010 | Light | $4,665.83 |
| Medical Insurance Clerk | 214.362-022 | Sedentary | $3,187.08 |
| Hospital-Admitting Clerk | 205.362-018 | Sedentary | $3,025.83 |
| Administrative Clerk | 219.362-010 | Sedentary | $3,120.00 |

Def.'s Facts at ¶ 97; Pl.'s Resp. at ¶ 97; Admin. R. at 444, 529.

> In summary, United of Omaha explained that

> the medical documentation fails to substantiate a condition or conditions that would render you totally disabled from any Gainful Occupation beyond January 4, 2017. We have been able to identify and also document our findings of Gainful Occupations with a physical demand of sedentary and or light. The occupations also meet the necessary gainful wage, sixty percent of your pre-disability wages, and exist in your local economy. Therefore, no benefits are payable beyond January 4, 2017, and your claim will be closed.

Def.'s Facts at ¶ 98; Pl.'s Resp. at ¶ 98; Admin. R. at 529. The letter concluded by explaining how Reichard could appeal United of Omaha's adverse determination. Def.'s Facts at ¶ 100; Pl.'s Resp. at ¶ 100; Admin. R. at 530–31.

### F.   Reichard's Appeal Correspondence

Reichard requested an appeal in a January 16, 2017 letter addressed to United of Omaha. Pl.'s Facts at ¶ 28; Def.'s Resp. at ¶ 28; Admin. R. at 345–48. In her letter, she raised several questions and concerns regarding United of Omaha's claim review. Admin. R. at 345–48. First, she did not receive records from Dr. Osterman in the review file, and United of Omaha omitted records from Dr. Luchetti in the review. Pl.'s Facts at ¶¶ 28A, C; Def.'s Resp. at ¶¶ 28A, C; Admin R. at 345. Second, the medical analysis omitted her medication change to ibuprofen from naproxen, which she discontinued due to severe abdominal pain. Pl.'s Facts at ¶ 28C; Def.'s

Resp. at ¶ 28C; Admin. R. at 345. Third, in its denial letter, United of Omaha used "inaccurate, outdated" documentation "scattered with several doctors" and "thrown together and unable to be clearly understood." Pl.'s Facts at ¶ 28D; Def.'s Resp. at ¶ 28 D; Admin. R. at 346. Fourth, she challenged Dr. Liebermann's conclusion that her Crohn's Disease had been stable since 2012 with gastrointestinal medical history from 2015 and 2016. Pl.'s Facts at ¶ 28E; Def.'s Resp. at ¶ 28E; Admin. R. at 346. Fifth, she challenged Dr. Golombek's conclusions as to her physical abilities based on a 20-minute visit in which she did not report his noted abilities, as well as his references to "Dr. Mark Listerman" and "Dr. Ravenelle." Pl.'s Facts at ¶ 28G; Def.'s Resp. at ¶ 28G; Admin. R. at 346–47. Sixth, United of Omaha failed to consider her medications and their side effects, which Reichard listed. Pl.'s Facts at ¶ 28H; Def.'s Resp. at ¶ 28H; Admin. R. at 347.[11] Finally, Reichard attached updated records and other records she alleged United of Omaha excluded in their review and concluded by requesting a reexamination of her claim. Pl.'s Facts at ¶ 28I; Def.'s Resp. at ¶ 28I; Admin. R. at 347–48.

During February and March of 2017, Reichard and United of Omaha representative Tim Fidler exchanged correspondence to finalize her medical records for consideration on review. *See* Pl.'s Facts at ¶¶ 29–32; Def.'s Resp. at ¶¶ 29–32; Def.'s Facts at ¶¶ 104–06; Pl.'s Resp. at ¶¶

---

[11] Reichard's unaltered listing of her medications, dosages, and side effects is as follows:
  Humera 40mg sq weekly- sweats, chills, fever, stomach pain, diarrhea, feeling tired.
  Lyrica75 mg bid-Sleepiness
  Lansoprazole 30 mg bid
  Folic acid 1 mg daily- diarrhea, upset stomach
  Noritriptyline 20mg at night
  Prednisone 5mg daily-anxiety, headache, irritability
  Methotrexate 2.5mg 3 tabs weekly-diarrhea, joint pain, stomach pain
  Ambian 10 mg bedtime
  Percocet 5-325mg q12hours-headache, nausea
  Hyoscyamine 0.125mg 2 tabs q6ours prn—bloated feeling, blurred vision, dry mouth, nervousness, headache
  Ibuprofen 600mg bid prn—stomach upset
  Diphen/atrop 2.5mg 2 tabs bid prn—drowsiness, dizziness, and headache
  Tizanidine HCL 4mg at night
  Zofran 2-4mg q8 prn-diarrhea, headache, tire feeling
Admin. R. at 347.

104–06; Admin. R. at 320–40. She explains the outcomes of recent appointments and submits supporting records. Admin. R. at 320-40. In her final email on March 2, 2017, she states, "This is the last of the medical record[s] as of now, so please su[b]mit my appeal. There are two physicians . . . that I have appointments for, but no current[] medical records for." Pl.'s Facts at ¶ 32; Def.'s Resp. at ¶ 32; Admin. R. at 320.

## G. Dr. Reeder's Medical File Review On Appeal

United of Omaha referred Reichard's LTD benefits claim to Dr. Reeder, Senior Vice President and Medical Director of United of Omaha, for a medical file review. Def.'s Facts at ¶ 108; Pl.'s Resp. at ¶ 108. Dr. Reeder, board-certified in internal medicine, issued the Medical File Review on March 21, 2017. Pl.'s Facts at ¶ 33; Def.'s Resp. at ¶ 33; Def.'s Facts at ¶¶ 108–09; Pl.'s Resp. at ¶¶ 108–09; Admin. R. at 291–302.

In his report, Dr. Reeder states that he reviewed: (1) STD claim procedural documents, including the STD claim form, denial letter, and appeal letter; (2) Reichard's job description; (3) her June 20, 2015 SRD; (4) her July 5, 2015 email in which she challenged omissions and conclusions in Nurse Grancer's review; (5) United of Omaha's December 30, 2016 denial letter; (6) 2017 correspondence from Reichard; (7) United of Omaha's own medical and vocational examinations and reviews, including Nurse Grancer's review, Palmer's TSA, Dr. Liebermann's peer review, and Dr. Golombek's IME report; and (8) Reichard's medical records, including those from Dr. Chiappetta (February 17, 2014, through February 9, 2016), Dr. Osterman (March 19, 2014, through July 27, 2016), Dr. Blanco (October 20, 2016, through February 22, 2017), Dr. Soraya Jiminez (June 28, 2014, through March 2, 2017), and Dr. Luchetti (August 1, 2014, through July 15, 2016). Admin. R. 291–92. He also acknowledges Reichard's LTD appeal

letter. *Id.* at 292. This section summarizes Reichard's medical records, organized by treatment provider, and discusses Dr. Reeder's analysis and conclusions from those records.

### 1. Treatment Records from Dr. Chiappetta, Rheumatologist and Primary Care Physician

The earliest evidence of treatment from Dr. Chiappetta in the administrative record appears to be from February 17, 2014, when Reichard sought an evaluation of right hip, knee, and right shoulder pain. Admin. R. at 72–75. Dr. Chiappetta summarizes Reichard's recent knee and hip treatment and symptoms: occasional tendinitis in the right hip and right knee, unsuccessful cortisone injections, an MRI and x-ray of the lumbar spine in the normal range, and aggravated symptoms at night. *Id.* at 74. She also summarizes Reichard's recent history of Crohn's disease, including "18 inches of bowel resection in January 2012." *Id.* She notes, "Since the surgery and now being maintained on generic, her bowel symptoms have been relatively stable with intermittent bouts of diarrhea." *Id.* In summary, she stated that Reichard presented with polyarthralgias and Crohn's disease, and her bowels had been "stable." *Id.* at 75. Reichard next visited on March 25, 2014, when Dr. Chiappetta "injected Synvisc-1 in both of her knees without any complication." Pl.'s Facts. at ¶ 44; Def.'s Resp. at ¶ 44; Admin. R. at 78.

During Reichard's next appointment on June 19, 2014, Dr. Chiappetta discussed with her a recent left knee MRI, the results of which were consistent with osteoarthritis in the medial compartment of the knee. Pl.'s Facts at ¶ 49; Def.'s Resp. at ¶ 49; Admin. R. at 82. She explained that there was

> evidence of chondral loss and some subchondral cyst formation but reactive marrow edema. I have tried Visco supplementation without avail as well as recurrent cortisone injections. . . . To completely exclude an inflammatory cause for this, related to her Crohn's disease, I am increasing her Humira to 40 mg every week from every other week. She will continue with Imuran.

*Id.* at 82–83.

Prior to Reichard's next appointment on September 25, 2014, Dr. Chiappetta submitted to United of Omaha the August 27, 2014 APS. *See* Section II.B., *supra*. At this next appointment, Dr. Chiappetta stated that Reichard was "having an exacerbation other [sic] underlying bowel disease," and gastrointestinal symptoms remained. *Id.* at 1136.

Following a January 29, 2015 appointment, Dr. Chiappetta's summary primarily discussed shoulder pain and bowel symptoms:

> Giovanna is status post injection of her right subacromial bursa today without any difficulty. She is doing well overall since Humira was increased to a weekly dose and methotrexate replace[d] her Imuran. She [is] still having some bowel symptoms however. She will follow up with gastroenterology.

Pl.'s Facts at ¶ 57; Def.'s Resp. at ¶ 57; Admin. R. at 1031. Prior to Reichard's next appointment, Dr. Chiappetta submitted to United of Omaha the July 7, 2015 APS. *See* Section II.B., *supra*. Dr. Chiappetta then evaluated Reichard on July 30, 2015, and wrote: "She continues with Humira, but is having increasing symptomatology and is going to Philadelphia tomorrow for a small bowel follow-through. Her sedimentation rate is mildly elevated at 31. Her main complaint [from] my standpoint is recurrent right shoulder pain." Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 1027. Reichard's final 2015 visit occurred on December 15, 2015, and Dr. Chiappetta analyzed the results of recent blood tests: "From her arthritis standpoint, she is doing very well . . . . However, my biggest concern is her elevated alkaline phosphatase as well as ALT. With he[r] history of inflammatory bowel disease, she has a higher chance of sclerosing cholangitis." *Id.* at 463. She also reviewed Reichard's gastrointestinal system, noting "abdominal pain, frequent diarrhea[,] and heartburn," and her mobility, noting that she has "problems with light household tasks and difficulty climbing stairs." *Id.* at 460.

Reichard's February 9, 2016 visit appears to be the last with Dr. Chiappetta in the administrative record, shortly following the February 3, 2016 APS. *See* Section II.B., *supra*.

The "Review of Systems" section of the February 9, 2016 office note, containing amendments by Kristyn Wolfer, documents night sweats, weakness or fatigue, immune deficiencies and daytime sleepiness, joint pain and muscle cramps, frequent headaches, numbness, tingling, loss of bowel control, depression and anxiety, abdominal pain, frequent diarrhea, heartburn, and dark or bloody stool. Pl.'s Facts at ¶ 79; Def.'s Resp. at ¶ 79; Admin. R. at 453. Dr. Chiappetta summarized the visit as follows:

> [S]he is doing well from my standpoint without any worsening symptoms. She will be started on methotrexate and hopefully this will help some of the bowel issues as well as some of th[e] bladder issues she's been having recently. . . . I do believe the elevation in her alkaline phosphatase is from her inflammato[ry] bowel disease.

Pl.'s Facts at ¶ 79; Def.'s Resp. at ¶ 79; Admin. R. at 456.

After summarizing Dr. Chiappetta's office notes and APSs, Dr. Reeder analyzed her conclusions and their applicability to Reichard's ability to work:

> Dr. Chiap[p]etta's office notes and claims of impairment are internally inconsistent. All of Dr. Chiap[p]etta's Attending Physician Statements up to . . . 2/3/16 indicated the insured's restrictions would be compatible with sedentary and light work. It is unclear why on 2/3/16 Dr. Chiap[p]etta stated the insured could sit eight hours, stand and walk one hour each in a work day, and could not work, yet on 2/9/16 Dr. Chiap[p]etta documented pain rating of 0/10, absence of distress, weight of 128 pounds, with normal blood pressure, pulse, respirations, [etc.]. . . . The same essentially normal findings were documented on every encounter in 2014 and 2015. The insured does have some minor laboratory abnormalities that are not relevant to her claim of disability. Liver function tests were transiently elevated. This could be related to her inflammatory bowel disease or her medications, but there is no current evidence of impaired liver function.
> . . . .
> . . . [T]he rheumatology examination by Dr. Golombek on 11/11/16 was essentially normal, including the insured's appearance and ability to walk, get on and off the table, general medical exam, range of motion of all joints, palpation of the joints, motor activity, and grip.

*See id.* at 292–95, 300-01.

### 2. Treatment Records from Dr. Osterman, Gastroenterologist

The earliest treatment notes in the administrative record from Dr. Osterman appear to be from March 19, 2014, in which he wrote that Reichard was

> [f]eeling fair. Some epigastric/[left upper quadrant abdominal] heaviness/[nausea] after eating . . . . 6 [bowel movements per day], solid-loose, [occasional] blood/mucus . . . . No more [right upper quadrant] pain, no more lower abdominal pain prior to [bowel movements]; no rectal pain. Still [occasional] rectal prolapse. No [vomiting]. . . . [Occasional fever, chills, and night sweats] . . . . No dysphagia.

Admin. R. at 157. Reichard called Dr. Osterman twice in the following weeks complaining of continued issues, including irregular bowel movements and abdominal pain. *See id.* at 98–102. Dr. Osterman ordered an abdominal ultrasound and noted she "will need to stop working for a while." *Id.* Other than his May 12, 2014 APS and accompanying FMLA form, *see* Section II.B., *supra*, no records from Dr. Osterman appear to exist until the following year.

Reichard next visited him for a colonoscopy and esophagogastroduodenoscopy ("EGD") on April 6, 2015. Pl.'s Facts at ¶ 60; Def.'s Resp. at ¶ 60; Admin. R. at 969–72. Dr. Osterman removed a four-millimeter polyp, described the distal colon as tubular, and found the EGD to be "grossly normal except for patchy erythema in the bulb." Admin. R. at 969, 971. Biopsies throughout the stomach and duodenum revealed inflammatory cells. *Id.* at 964–67, 969, 971.

Around this same time, Dr. Osterman opined that Methotrexate could be causing irregular menses, although the issue seemed to be resolving by June 2015. *See* Pl.'s Facts at ¶¶ 61–63; Def.'s Resp. at ¶¶ 61–63; Admin. R. at 933, 940, 946. Dr. Osterman next referred Reichard for an upper gastrointestinal series on August 6, 2015, in which the examiner concluded: "1. No Crohn's disease seen in small intestine, with normal side-to-side ileocolonic anastomosis and neoterminal ileum[;] 2. Thick, nodular folds ascending colon suggesting possibility of Crohn's disease in the right colon." Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 369–70.

The final office visit note in the administrative record with Dr. Osterman is from February 8, 2016.[12]  *See* Admin. R. at 426–28.  Dr. Osterman noted that Reichard was experiencing ten to twelve bowel movements per day, loose stool with occasional mucus and rare blood, some incontinence, occasional rectal pain, continued occasional rectal prolapse, occasional nausea and vomiting upon waking, continued upper abdominal pain and nausea possibly caused by small bowel obstruction, and irregular menses, although no lower abdominal pain after bowel movements.  *Id.* at 426.  Despite increasing muscle strength, biofeedback had not helped Reichard's fecal incontinence.  *Id.*  He recommended that Reichard restart taking Methotrexate.  *Id.* at 427.  The visit diagnoses were Crohn's disease of both small and large intestine with intestinal obstruction, long-term use of immunosuppressant medication, abdominal pain in the right and left upper quadrants, epigastric abdominal pain, diarrhea, nausea and vomiting, joint pain, dysphagia, gastroesophageal reflux disease without esophagitis, heartburn, inflammatory arthritis, vitamin B12 deficiency, and fecal incontinence.  Pl.'s Facts at ¶ 78; Def.'s Resp. at ¶ 78; Admin. R. at 428.

After summarizing Dr. Osterman's office notes, his Attending Physician Statement, and Reichard's colonoscopy and EGD records, Dr. Reeder concluded:

> Dr. Osterman was her long[-]term gastroenterologist.  When the insured went out of work on 5/12/14, he opined that in an eight[-]hour work day, she could sit six to eight hours, stand and walk, work with others, and had normal finger dexterity. He opined that she [c]ould occasionally lift and carry up to 50 pounds. . . .  While the insured claims that her current disability in part is related to incontinence of rectal prolapse, she had had these symptoms prior to the date of disability.

*Id.* at 300.

---

[12] Reichard also underwent a colonoscopy in July 2016, although it is unclear whether Dr. Osterman oversaw this procedure.  *See* Admin. R. at 371–73.  The administrative record only includes the pathology report, which does not appear to contain remarkable findings, and Reichard does not address the colonoscopy in her statement of facts.  *See id.*

### 3.  Treatment Records from Dr. Blanco, Gastroenterologist

After six years of seeing Dr. Osterman for gastroenterological treatment, Reichard returned to her former gastroenterologist, Dr. Paola Blanco, on October 20, 2016.  *Id.* at 257–59. In her visit summary, Dr. Blanco wrote:

> Symptoms include abdominal pain, abdominal cramping, diarrhea[,] and rectal bleeding.  Current treatment includes oral corticosteroids, methotrexate . . . [,] and Humira . . . .  Last colonoscopy was 4 months ago; did not show active disease. Does complain of rectal prolapse; has tried biofeedback.  Last [upper gastrointestinal series] . . . was normal.
>       . . . .
>       . . . Spent more than 30 min[utes] discussing w[ith] patient.  I am not sure if her [symptoms] are from Crohn's[,] short gut[,] or pelvic floor dysfunction. . . . I do not have [Dr. Osterman's] records.  Will discuss with him.  Suggested trial of Questran.  Order MRE and blood work.  May need refer[r]al to colorectal for stool incontinence.

Pl.'s Facts at ¶ 81; Def.'s Resp. at ¶ 81; Admin. R. at 257, 259.  Following a MR enterography on January 20, 2017, resulting in findings "suggestive of chronic rectosigmoid inflammatory changes" and "[n]o acute findings . . . in the small or large bowel," Reichard revisited Dr. Blanco on February 21, 2017.  Pl.'s Facts at ¶ 84; Def.'s Resp. at ¶ 84; Admin. R. at 254–56, 260–61. Dr. Blanco wrote that starting Reichard on iron had improved her stool quality.  Admin. R. at 254.  Reichard was now experiencing approximately five bowel movements daily, paroxysms of severe diarrhea (but also periods of constipation), and bloody stool when she strained to move her bowels.  Pl.'s Facts at ¶ 86; Def.'s Facts at ¶ 86; Admin. R. at 254.  Dr. Blanco switched Reichard to Remicade because her last colonoscopy showed active Crohn's disease and suggested that she may benefit from a rectal stimulator.  Pl.'s Facts at ¶ 86; Def.'s Facts at ¶ 86; Admin. R. at 256.

After summarizing Dr. Blanco's treatment notes, Dr. Reeder concluded:

> The insured is now seeing another gastroenterologist, Dr. Blanco.  The records supplied from Dr. Blanco did not include a history of physical exam. . . .

Apparently, MR enterography revealed rectosigmoid inflammation, but according to the 2/21/17 note, she was having about five bowel movements a day. Again, there was no examination. Dr. Blanco prescribed Questran primarily for [the] side effect of constipation.

According to the claims analyst, the insured is seeing [a] rectal surgeon and is going to have surgical treatment of the rectal prolapse. However, there is nothing in the records to indicate that this is a constant issue and would not impact her ability to do seated work.

The Gastroenterology Peer Review by Dr. Liebermann did not support any GI restrictions or limitations . . . .

*Id.* at 301.

#### 4.    Treatment Records from Dr. Jiminez, Neurologist

Reichard received neurology treatment for headaches from Dr. Jimenez and associated physician assistants, Krista Remmel ("Remmel") and Courtney Bloss ("Bloss"). In the earliest neurology note in the administrative record, Reichard visited Remmel as a "follow[-]up for headaches" on June 28, 2014, her first visit in two years. Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 59. Reichard reported a few episodes of dizziness at work and indicated that she had to hang onto the wall because she felt like the room was spinning. Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 59. Remmel noted that Reichard's Crohn's disease had been flaring up resulting in her not eating while working, which in turn possibly caused vertigo, hypovolemia, or hypoglycemia. Admin R. at 59, 63. She discontinued Topamax after developing blurred vision on the medication. Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 59. Additionally, "[D]aily tension headaches in [Reichard's] neck and posterior scalp" persisted, including "more severe headache[s] during her period," although they were less severe than in the past. Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 59.

Reichard next visited Kimmel on September 2, 2015, reporting daily headaches of four-out-of-ten pain, menstrual headaches at eight-out-of-ten-pain, and muscle spasms in the neck. Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 689, 692. Kimmel repeated trigger point

injections that Reichard had previously found helpful, concluded that there was no need for an MRI given the normal exam, and instructed Reichard to use Maxalt as needed and increase her Zanaflex dosage. Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 692. Kimmel advised Reichard to take the Zanaflex at bedtime due to sedation. Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 689, 692.

Bloss saw Reichard for her next appointment on January 14, 2016. Pl.'s Facts at ¶ 77; Def.'s Resp. at ¶ 77; Admin. R. at 695–700. Reichard reported tension headaches lasting one to three days and occurring once per month, limiting her use of Zanaflex because she gets tired on it, avoiding Maxalt for non-migraine headaches, and that taking both Zanaflex and ibuprofen was not effective in treating headaches. Pl.'s Facts at ¶ 77; Def.'s Resp. at ¶ 77; Admin. R. at 695. Bloss instructed her to try naproxen in addition to Zanaflex for the monthly tension headaches, opining that this limited use of NSAIDs should "be fine" with her Crohn's disease. Pl.'s Facts at ¶ 77; Def.'s Resp. at ¶ 77; Admin. R. at 698.

Reichard returned on November 16, 2016, visiting with Dr. Jiminez, who indicated that ibuprofen was now helping the menstrual headaches, although left arm numbness now accompanied headaches. Pl.'s Facts at ¶ 82; Def.'s Resp. at ¶ 82; Admin R. at 359. The left arm numbness prompted Dr. Jiminez to order an MRI of the cervical spine, which revealed evidence of osseous fusion and slightly increased spondylosis on December 6, 2016. Pl.'s Facts at ¶ 83; Def.'s Resp. at ¶ 83; Admin. R. at 380–81. Dr. Jiminez last saw Reichard on February 8, 2017, for a follow-up, at which she listed left arm numbness, neck muscle spasms, and menstrual migraines as active problems. Pl.'s Facts at ¶ 85; Def.'s Resp. at ¶ 85; Admin. R. at 321–24.

After summarizing Reichard's neurology treatment, including the noted Topamax and Zanaflex side effects, Dr. Reeder concluded that the "neurological records from Dr. Jiminez

never documented focal neurological deficits, only tenderness to palpation of the cervical muscles," and the MRI demonstrated "no evidence of spinal cord or nerve root contact."  Admin. R. at 296, 301–02.

### 5.    Treatment Records from Dr. Luchetti, Orthopedist

Dr. Luchetti treated problems with Reichard's knees and shoulder.  On August 1, 2014, Reichard visited Dr. Luchetti complaining of bilateral knee pain.  Pl.'s Facts at ¶ 50; Def.'s Resp. at ¶ 50; Admin. R. at 1148–50.  His assessment was osteoarthritis, and he concluded, "When the pain becomes intolerable she is a candidate for a unicompartmental knee replacement."  Pl.'s Facts at ¶ 50; Def.'s Resp. at ¶ 50; Admin. R. at 1149–50.  Reichard saw Dr. Luchetti three weeks later on August 21, 2014, complaining of shoulder pain after slipping on black ice the prior winter.  Admin. R. at 1145–47.  An x-ray revealed no acute fracture or dislocation, but mild degenerative joint disease and type 1 acromial morphology.  *Id.* at 1147.  Dr. Luchetti ordered an MRI to determine whether a rotator cuff tear was causing her supraspinatus weakness, which was negative.  Pl.'s Facts at ¶¶ 51–53; Def.'s Resp. at ¶¶ 51–53; Admin. R. at 1143, 1147. Reichard returned on September 18, 2014, to discuss and schedule left unicompartmental knee replacement surgery.  Pl.'s Facts at ¶ 54; Def.'s Resp. at ¶ 54; Admin. R. at 1137–40.  Dr. Luchetti performed the surgery on October 6, 2014, without apparent complications.  *See* Admin. R. at 1151–53.

At her one-year follow-up appointment on October 6, 2015, Reichard reported the knee was doing okay with no swelling, and an x-ray revealed the prosthesis was in place and in proper alignment.  Pl.'s Facts at ¶ 67; Def.'s Resp. at ¶ 67; Admin. R. at 470–72.  However, Reichard returned on November 19, 2015, complaining of left knee pain.  Pl.'s Facts at ¶ 68; Def.'s Resp. at ¶ 68; Admin. R. at 467–69.  Dr. Luchetti aspirated bloody fluid from the knee and sent it for a

culture, which was negative for an infection. Admin. R. at 466, 469. He referred her to physical

therapy for strengthening and recommended ice and rest on November 23, 2015. *Id.* at 466. She

visited a physical therapist, Mario Carranza, several times through November and December of

2015, and at one appointment stated that she was sore after camping and lifting a lot the previous

weekend. Pl.'s Facts at ¶¶ 70–72, 76; Def.'s Resp. at ¶¶ 70–72, 76; Admin. R. at 473-87.

At her next appointment with Dr. Luchetti on December 22, 2015, Reichard felt that

physical therapy had helped, although she had back knee aching and soreness after "a lot of

shopping the other day." Admin. R. at 457–59. Dr. Luchetti concluded, "The knee is doing well

at this time." Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 458. At her final visit

included in the administrative record, she presented with mild swelling and trace effusion, and

Dr. Luchetti advised her to call if she had any increased pain, swelling, fever, or chills. Pl.'s

Facts at ¶ 80; Def.'s Resp. at ¶ 80; Admin. R. at 354–58.

> After summarizing Dr. Luchetti's treatment notes, Dr. Reeder concluded:
>
> Dr. Luchetti's records document a good result of the unicompartmental medial
> left knee arthroplasty. The left knee aspiration for bloody fluid from 11/19/15
> produced some negative culture. She continued to do well and, in fact, on
> 12/22/15, she had some knee discomfort because she had done a lot of shopping.
> On 7/15/16, Dr. Luchetti documented that his patient had no problems with
> bathing, dressing, eating, light household chores, climbing stairs, and had no falls
> or needed assistive devices. The left knee examination was essentially normal,
> except for trace effusion. X-rays revealed no abnormality of the knee or
> prosthesis. The only recommendation was continued icing.

*Id.* at 300.

### 6.    Dr. Reeder's Conclusions and Recommendations

After summarizing and analyzing the above records, as well as the APSs on file, Dr.

Reeder ended his Medical File Review by listing several bulleted conclusions:

- The insured has recovered from a unicompartmental knee arthroplasty. There
  is no current evidence of impairing arthritis of either knee.

- The insured has [a] longstanding history of tension and menstrual headaches. Detailed neurological exams since June of 2014 failed to document any deficits.
  . . . .
- While the insured has been diagnosed with fibromyalgia, there is no evidence of physical functional impact from this condition. She does not take pain medications in significant quantities[,] and there is no evidence of loss of function related to fibromyalgia given the normal manual muscle testing, range of motion, and strength, and gait documented by multiple providers.
- Colonoscopies, multiple biopsies, and MR enterography suggests [sic] some degree of inflammatory bowel disease activity, but this has not resulted in nutritional problems, hypoalbuminemia, anemia (low iron level accepted). No evidence of significant malabsorption.
- Physical restrictions imposed by Dr. Golombe[]k on 11/11/16 would continue to apply. These restrictions and limitations are consistent with all those from Dr. Chiap[p]etta until the inexplicable 2/3/16 Attending Physician Statement.
- Dr. Blanco has not imposed any restrictions or limitations.

*Id.* at 301. He recommended that United of Omaha obtain Dr. Blanco's treatment records, and he stated that he will continue to attempt to contact Reichard's doctors concerning current restrictions and limitations. *Id.* at 301–02.

## H.    Dr. Reeder's Correspondence With Reichard's Doctors

In the month after issuing his Medical File Review, Dr. Reeder sent correspondence to Drs. Chiappetta, Luchetti, Jiminez, and Blanco requesting their opinions as to his conclusions following his review of Reichard's records and the reports of Drs. Liebermann and Golombek. Def.'s Facts at ¶¶ 115, 118, 121, 125; Pl.'s Resp. at ¶¶ 115, 118, 121, 125. In each letter, Dr. Reeder stated, "[I]f I do not hear from you within 10 days of the receipt of this information, I will assume that you are in agreement with the content of this letter." Def.'s Facts at ¶¶ 117, 120, 127; Pl.'s Resp. at ¶¶ 117, 120, 127; Admin. R. at 228, 245, 275, 280. Only Dr. Jiminez responded, signing the letter in which Dr. Reeder stated that "there is no evidence of neurological deficits that would result in work restrictions." Def.'s Facts at ¶¶ 117, 120, 123, 124, 127; Pl.'s Resp. at ¶¶ 117, 120, 123, 124, 127; Admin R. at 249–50.

# I.     United Of Omaha's Denial Of Reichard's Appeal

United of Omaha denied Reichard's appeal by letter dated May 2, 2017. Def.'s Facts at ¶ 128; Pl.'s Resp. at ¶ 128; Admin. R. at 217–23. In making its determination, United of Omaha relied on roughly the same documents as Dr. Reeder, updated to include his medical file review and his four letters to Reichard's physicians in March and April of 2017.[13] *See* Def.'s Facts at ¶ 129; Pl.'s Resp. at ¶ 129; Admin R. at 218–19, 291–92. After summarizing Dr. Reeder's medical file review, United of Omaha explained:

> On August 22, 2016, a Transferable Skills Assessment was completed, which identified occupations in your area at a light and sedentary strength demand that exceeded the gainful wage as defined in your Long-Term Disability policy.
>
> The Physician Consultant opined the documentation and clinical examinations fail to support restrictions and limitations that would preclude you from completing the Material Duties of any Gainful Occupation. Your medical records do not contain evidence of impairing arthritis of your knees. Dr. Luchetti noted on July 15, 2016, you had no problems with bathing, dressing, eating, light household chores, climbing stairs, had no falls, or needed assistive devices. Furthermore, imaging of your knee has revealed no abnormalities. Your complaints of tension and menstrual headaches are not corroborated by your medical records as the detailed neurological examinations in your file fail to document any deficits. Additionally, while your file shows the presence of inflammatory bowel disease, no nutritional problems, hypoalbuminemia, anemia, or significant malabsorption has been noted. Moreover, your diagnosis of fibromyalgia is not supported by the information contained in your file. There is no evidence of a physical or functional impact from this condition; your medical records report normal manual muscle testing, range of motion, strength.
>
> To give your claim further consideration, a letter from our Physician Consultant was faxed to Dr. Jiminez, Dr. Luchetti, Dr. Blanco, and Dr. Chiap[p]etta. We asked that your providers comment on the results of the medical review completed by our Physician Consultant or to sign in agreement with the results of our review. A telephone call was made to the providers' offices to confirm the letters were received. We did not receive a response from Dr. Luchetti, Dr. Chiap[p]etta, or Dr. Blanco. However, Dr. Jiminez did sign the letter in agreement with our assessment.
>
> In summary, our review of the file does not find support for restriction[s] or limitations in your physical or mental functional capacity to preclude you from

---

[13] United of Omaha's list of documents review varies from Dr. Reeder's in that it (1) adds lab testing (September 11, 2014, through February 1, 2016), (2) adds neurology records from Remmel (January 14, 2016, through September 2, 2016), (3) shifts the reviewed time period of Dr. Chiappetta's records (October 6, 2015, through July 15, 2016), and (4) excludes Dr. Luchetti's records from before August 26, 2014. *See* Admin R. at 218–19, 291–92.

performing the Material Duties of any Gainful Occupation.  Therefore, we have upheld the prior claim denial and no further benefits are payable for your claim.

Def.'s Facts at ¶¶ 130–33; Pl.'s Resp. at ¶¶ 130–33; Admin. R. at 219–22.  With the denial of Reichard's appeal to United of Omaha, she had exhausted her administrative remedies.  Def.'s Facts at ¶ 135; Pl.'s Resp. at ¶ 135; Admin. R. at 222.

### J.        Reichard's SSD Claim

When United of Omaha initially granted LTD benefits on November 4, 2014, it explained to Reichard that

> Mutual of Omaha has partnered with three (3) firms specializing in SSD. You may be contacted by one of these firms to offer their assistance in filing for SSD benefits.  This service is of no charge to you.  Mutual of Omaha will review your claim before sending it over to be assessed by these firms. . . .
> Once you have applied, please provide our office proof of your application.  We will also need you to forward copies of all correspondence you may receive from the Social Security Administration as your application progresses.
> Your policy provides that in the case of an overpayment of benefits to you, we may, at our discretion, retain any future disability payments and apply those against the overpayment until your overpayment has been fully repaid.  In these cases you may be contacted by an overpayment specialist.

Def.'s Facts at ¶ 55; Pl.'s Resp. at ¶ 55; Admin. R. at 1115.  The Advocator Group, presumably one of the three firms referenced, began representing Reichard in December 2014 to prepare and submit her Social Security Disability Insurance ("SSDI") application to the Social Security Administration ("SSA").  Pl.'s Facts at ¶ 87A; Def.'s Resp. at ¶ 87A; *see* Admin. R. at 1092 (email from Advocator Group to United of Omaha advising of representation).

Reichard then applied for SSDI in January 2015.  Admin. R. at 887, 993.  The SSA denied her initial application in March 2015.  Pl.'s Facts at ¶ 87B; Def.'s Resp. at ¶ 87B; *see* Admin. R. at 1079–84 (March 19, 2015 email from Advocator Group to United of Omaha advising of and attaching March 9, 2015 notice of denial).  By November 2016, the SSA had

scheduled a January 2017 hearing date for Reichard's SSDI claim. Pl.'s Facts at ¶ 87C; Def.'s Resp. at ¶ 87C; *see* Admin. R. at 553 (email from Advocator Group to United of Omaha informing of hearing date). By notice dated May 14, 2017, the SSA awarded Reichard SSDI benefits. Pl.'s Facts at ¶ 40; Def.'s Resp. at ¶ 40. On June 6, 2017, the Advocator Group emailed United of Omaha to transmit the notice of the award. Pl.'s Facts at ¶ 40; Def.'s Resp. at ¶ 40; Admin R. at 207–10.[14]

## III.    DISCUSSION

### A.    Standards Of Review

#### 1.    Summary Judgment Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

---

[14] The Advocator Group appears to have sent Reichard a letter dated April 12, 2017, informing her that the SSA had approved her claim. *See* Decl. of Reichard in Supp. of Mot. for Summ. J/Alternative Mot. for J. pursuant to Rule 52 at ECF pp. 1, 4, Doc. No. 42-4. The letter states, "As you are aware, we received notice that your [SSD] claim has been awarded. If you have not received a favorable decision or award correspondence, please inform us immediately." *Id.* United of Omaha objects to any consideration of this fact because it is outside the administrative record. *See* Def.'s Resp. at ¶ 88.

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

The court "may not weigh the evidence or make credibility determinations." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets., Inc. v. Darling–Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Instead, "[w]hen considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation and internal quotation marks omitted).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment. *Erbe v. Connecticut Gen. Life Ins. Co.*, No. CIV.A. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)). "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Transguard*, 464 F. Supp. 2d at 430).

## 2.     Standard of Review for Benefit Denials Under ERISA

The plaintiff has brought this action under section 502(a)(1)(B) of ERISA, which permits a participant or beneficiary of a covered policy to bring a civil action to recover the benefits due under the terms of the policy. 29 U.S.C. § 1132(a)(1)(B). Generally, the court must review the

denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations," the court must review its decision "under an abuse-of-discretion (or arbitrary and capricious) standard." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citations omitted).[15]

Here, the parties agreed in their submissions that the court should apply the abuse of discretion (or arbitrary and capricious) standard of review in this case. *See* Pl.'s Opening Br. Supp. Mot. Summ. J./Alternative Mot. J. FRCP Rule 52 ("Pl.'s Br.") at 1, Doc. No. 42-2; Def. United of Omaha's Br. Supp. Mot. Summ. J. ("Def.'s Br.") at 5, Doc. No. 41-1. Under this standard, "[a]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (internal quotations omitted). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

The arbitrary and capricious standard of review "is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted). Although "the arbitrary and capricious standard is extremely deferential, [i]t is not ... without some teeth. Deferential review is not no review, and deference need not be abject."

---

[15] The abuse-of-discretion standard and the arbitrary and capricious standard are used "interchangeably" in ERISA cases. *Viera*, 642 F.3d at 413.

*Kuntz v. Aetna Inc.*, No. CIV. A. 10-877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013)

(citations and internal quotation marks omitted); *see Connelly v. Reliance Standard Life Ins. Co.*,

No. CIV. A. 13-5934, 2014 WL 2452217, at *4 (E.D. Pa. June 2, 2014) ("Although the arbitrary

and capricious standard is highly deferential, the court must still consider the quality and

quantity of the medical evidence and the opinions on both sides of the issues, so as to avoid

rendering courts 'nothing more than rubber stamps for any plan administrator's decision.'"

(quoting *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co.*

*v. Glenn*, 554 U.S. 105 (2008)).

> In addition,
>
> [o]n a motion for summary judgment in an ERISA case where the plaintiff claims
> that benefits were improperly denied, a reviewing court is generally limited to the
> facts known to the plan administrator at the time the decision was made. *Post v.
> Hartford Ins. Co.,* 501 F.3d 154, 168 (3d Cir 2007), *overruled on other grounds,
> Doroshow,* 574 F.3d 230. "Consequently, when, as here, a plaintiff alleges that a
> plan administrator . . . abused its discretion in deciding to terminate benefits, [the
> Court] generally limit[s][its] review to the administrative record, that is, to the
> 'evidence that was before the administrator when [it] made the decision being
> reviewed.'" *Sivalingam v. Unum Provident Corp.,* 735 F.Supp.2d 189, 194 (E.D.
> Pa. 2010) (quoting *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.
> 1997)); *see also Johnson v. UMWA Health & Ret. Funds,* 125 F. App'x 400, 405
> (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and
> capricious review of ERISA benefits denial is the record made before the Plan
> administrator, which cannot be supplemented during the litigation.").

*Plank v. Devereux Found.*, No. CIV. A. 13-7337, 2015 WL 451096, at *6 (E.D. Pa. Feb. 2, 2015)

(alterations in original).

As an additional point, the plaintiff appears to argue that there are "procedural" conflicts

of interest insofar as there were several deficiencies in United of Omaha's decision-making

process. *See* Pl.'s Br. at 9–13, 31–36. With regard to purported conflicts of interest,

> courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil
> enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply
> a deferential abuse of discretion standard of review across the board and consider

40

any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

*Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citations omitted). As such, the court must "review various procedural factors underlying the administrator's decision, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious." *Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). In this regard, "'the procedural inquiry focuses on how the administrator treated the particular claimant.'" *Id.* (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007), *abrogated on other grounds by Estate of Schwing*, 562 F.3d 522 (3d Cir. 2009)). When reviewing "the process that the administrator used in denying benefits," courts consider "numerous 'irregularities' to determine 'whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.'" *Id.* (quoting *Post*, 501 F.3d at 165).[16]

When a court weighs a conflict of interest,

> [t]he mere existence of a conflict is not determinative, . . . and a conflict on its own does not change our standard of review from deferential to *de novo*. A conflict is just another factor . . . . The conflict may act as a tiebreaker when the other factors are closely balanced, or it may mean little at all, depending on the other factors at play. Also, the circumstances of the conflict itself may render it more or less significant, depending on whether those circumstances suggest a higher likelihood that the conflict actually affected the benefits decision. For example, if an insurance company administrator has a history of biased claims

---

[16] In *Post*, the Third Circuit identified the following "illustrative, not exhaustive, list of [identified irregularities]: (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability[.]" 501 F.3d at 165 (internal citations omitted). Some other examples of

> [p]rocedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason; failing to follow a plan's notification provisions; . . . relying on favorable parts while discarding unfavorable parts in a medical report; [and] denying benefits based on inadequate information and lax investigatory procedures.

*Morgan v. The Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 643 (E.D. Pa. 2010) (internal citations omitted).

administration, then it is more likely the conflict affected the benefits decision, and the court may grant less deference to the plan administrator.

*Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250 (3d Cir. 2017) (internal quotations and citations omitted), *cert. denied*, 138 S. Ct. 1032 (2018).

Because conflict of interest evidence may not be part of the administrative record, a court may consider extrinsic conflict evidence as an exception to the general rule that review is limited to the administrative record. *See Post*, 501 F.3d at 168. The exception is a "necessity" because a "plan participant may be unaware of information relating to an administrator's conflict until well after the administrative process has ended, and a conflicted administrator, especially one whose decision-making has been affected by that conflict, is not at all likely to volunteer that information." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 794 (3d Cir. 2010).

### B.     Analysis

As indicated above, the parties filed cross-motions for summary judgment. The court will first address Reichard's motion.

### 1.     Reichard's Motion for Summary Judgment

Reichard argues that United of Omaha's decision to terminate her LTD benefits was arbitrary and capricious for the following reasons: (1) it failed to conduct a full and fair review of her claim because it does not have a standardized claims procedure, contrary to both the Policy and ERISA regulations; (2) it failed to consider that the side effects of her medications alone render her totally disabled; (3) it did not take her SSDI award into consideration; (4) substantial evidence does not support United of Omaha's decision because each of its medical and vocational reviews and examination contain errors and omissions rendering them unreliable; (5) United of Omaha's use of Dr. Reeder on appeal demonstrates a lack of fiduciary neutrality; (6)

United of Omaha disregarded her complaints of pain and fatigue; and (7) United of Omaha failed to consider the cumulative effect of her conditions. The court addresses each argument in turn.

a.     <u>Whether United of Omaha Considered Reichard's Claim with a Standardized Procedure</u>

Reichard alleges that United of Omaha denied her a full and fair review by failing to follow a standardized procedure in considering her claim. *See* Pl.'s Br. at 2, 17–20. Specifically, United of Omaha did not use a claims manual in considering Reichard's claim, and thus, it "has no documents which demonstrate compliance with administrative processes and safeguards required under the Regulations."[17] *Id.* at 20. In support of her argument, Reichard cites a Department of Labor ("DOL") regulation enforcing ERISA, which states:

> Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations (hereinafter collectively referred to as claims procedures). The claims procedures for a plan will be deemed to be reasonable only if . . . [t]he claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

29 C.F.R. § 2560.503-1(b)(5).

Reichard's argument that United of Omaha failed to comply with this regulation by not utilizing a claims manual, or otherwise adhering to a standardized claim review procedure, is unpersuasive for three reasons. First, the factual foundation of Reichard's claims manual argument relies on evidence outside of the administrative record: United of Omaha's interrogatory response in which it stated that it had not used a claims manual for at least five

---

[17] Reichard appears to incorporate several other alleged errors—failure to consider her medication side effects and other issues raised on appeal, failure to consider her SSDI award, and use of Dr. Reeder on appeal— into a more global argument that United of Omaha failed to provide her with a full and fair review. *See* Pl.'s Br. at 2, 17, 20. Because these alleged errors squarely overlap with her remaining asserted grounds for relief, and the vast majority of Reichard's full-and-fair-review argument pertains to an alleged failure to follow standardized procedures, the court waits to address the remaining alleged errors in the sections below.

years. Because Reichard does not allege that this fact relates to a purported conflict of interest that would permit the court considering it as evidence extrinsic to the administrative record, it arguably falls outside of the court's review.

Second, even assuming that the court may properly consider United of Omaha's interrogatory response, section 2560.503-1(b)(5) does not require a separate claims manual. The plain text of the regulation does not reference a claims manual, and Reichard does not cite (nor could the court find) any case law either interpreting the regulation as imposing that requirement or holding that the failure to use a separate claims manual constituted an abuse of discretion. The regulation does not prescribe a precise written format to memorialize a plan's claims procedures. In fact, Reichard herself quotes the DOL's commentary from the Federal Register interpreting section 2560.503-1(b)(5) which rejects a rigid format requirement:

> [T]his provision does no more than to require a plan to formalize, as a part of its claims procedures, the administrative processes that it must already have established and be using in operating the plan in order to satisfy basic fiduciary standards of conduct under the Act. The Department has not articulated specific requirements as to how such processes should be designed, believing that plans should have flexibility and are capable of monitoring their internal decisionmaking effectively and efficiently.

ERISA; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,252 (Nov. 21, 2000). Assuming *arguendo* that the court may consider United of Omaha's disuse of a claims manual, the fact is inconsequential as a matter of law.

Third, as a matter of fact, Reichard does not raise any specific shortcomings of the Policy at issue here, which appears to comply with section 2560.503-1(b)(5). The Policy effectively implements the Plan, instructs claimants on how to file a benefits claim, describes how a claimant will receive notice of a determination, and provides for an opportunity to appeal—*i.e.* the exact components of "claims procedures," as defined in the regulation. In other words, the

Policy here accomplishes precisely what Reichard envisions. Beyond her claims manual argument, Reichard does not clarify how United of Omaha's claims procedures fail conform to the remainder of section 2560.503-1(b)(5). It is also unclear how the Plan failed to, in the language of the regulation, "contain administrative processes and safeguards . . . to ensure . . . that . . . determinations are made in accordance with governing plan documents." 29 C.F.R. § 2560.503-1(b)(5). Reichard also alleges inconsistent application of plan provisions, but she fails to raise an example of another similarly situated claimant, allowing for a comparison between claims. Thus, she has failed to demonstrate how United of Omaha's claims procedures are defective, let alone arbitrary and capricious.

b.    United of Omaha's Consideration of the Side Effects of Reichard's Medications

Reichard argues that United of Omaha abused its discretion by ignoring the side effects of her medications, which she listed in her appeal correspondence. *See* Pl.'s Br. at 2, 20–22. In support, she cites case law standing for the proposition that a plan administrator abuses its discretion by failing to consider the disabling effects of a claimant's medications. *See, e.g.*, *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 264 (6th Cir. 2006) (concluding that administrator abused its discretion by merely listing some of plaintiff's medications and ignoring physician's opinion that side effects would make it impossible for plaintiff to "function under any circumstances"); *Charles v. UPS Nat'l Long Term Disability Plan*, 145 F. Supp. 3d 382, 404 (E.D. Pa. 2015) (determining that administrator abused its discretion by ignoring physician's opinion that plaintiff could not work full-time because his medication caused significant sedation); *Adams v. Prudential Ins. Co. of Am.*, 280 F. Supp. 2d 731, 738, 740 (N.D. Ohio 2003) (finding that administrator abused its discretion by ignoring plaintiff's side effects from narcotic pain relievers, confirmed in letter by plaintiff's doctor to administrator stating, "[T]his gentleman

takes Oxycontin and Demerol on a daily basis and I think it is just sort of absurd for you people to say that he can work taking those medications. It is difficult for this young man to make it to my office for an appointment, much less do an 8[-]hour job"); *Dirnberger v. Unum Life Ins. Co. of Am.*, 246 F. Supp. 2d 927, 934–35 (W.D. Tenn. 2002) ("Defendant failed to take into account what effect . . . medications would have on [the plaintiff's] ability to fulfill his job requirements. . . . [His physician] plainly stated that the medications rendered Plaintiff disabled."); *cf. Ackaway v. Aetna Life Ins. Co.*, No. CV 14-1300, 2016 WL 5661724, at *29 (E.D. Pa. Sept. 30, 2016) (distinguishing *Charles* and finding no abuse of discretion where administrator merely failed to consider the plaintiff's own "self-diagnosis," in which she drew the only connection in the record between medications and her complaints of fatigue and memory loss).

Reichard's argument is unpersuasive because she fails to cite to a medical opinion in the administrative record (or any opinion other than her own) indicating that the side effects of her medications render her disabled. Nor was her counsel able to identify records in support of her purportedly disabling side effects at oral argument. Other than repeating the side effects listed in her appeal letter to United of Omaha, her statement of undisputed material facts only contains brief references to apparently transitory side effects. *See, e.g.*, Pl.'s Facts at ¶ 46 (quoting Remmel stating, "She developed blurred vision on Topamax that was discontinued and that improved her vision"); *id.* at ¶¶ 62, 63 (quoting a May 18, 2015 record stating, "Discussed irregular menses with her GI doctor who feels that methotrexate may be causing this," and then quoting June 23, 2015 record stating, "Menstrual irregularity seems to be resolving"); *id.* at ¶ 66 (describing how Zanaflex helped her headaches, but caused sedation during the day; Remmel advised her to take her dosage at bedtime). Nor does Reichard's appeal letter, brief, or statement of undisputed material facts suggest how her alleged side effects impact her ability to work. In

short, by Reichard's own telling, it is unclear how the medical records in this case support the presence of disabling side effects.

Accordingly, this case is distinguishable from those cited by Reichard in which courts found that plan administrators acted arbitrarily and capriciously by ignoring disabling side effects. In *Smith*, *Charles*, *Adams*, and *Dirnberger*, the plaintiffs' physicians opined that medication side effects impeded or foreclosed the plaintiffs' work capacity. Here, no analogous opinion exists. Instead, this case resembles *Ackaway*, in which the plaintiff's own assertion was the sole source of purportedly disabling side effects. As in *Ackaway*, the administrator here "could not have committed an abuse of discretion for failing to consider the plaintiff's self-diagnosis." 2016 WL 5661724, at *29.

United of Omaha also considered some of the few instances of documented side effects on appeal, contrary to Reichard's argument that non-consideration of side effects belied a full and fair review. Dr. Reeder discussed two examples mentioned above in his summary of the medical evidence—how Reichard discontinued Topamax due to blurred vision, and how Zanaflex caused sedation. On the one hand, blurred vision and sedation are just two of the many side effects Reichard listed in her appeal letter: sweats, chills, fever, stomach pain, upset stomach, diarrhea, anxiety, nervousness, headaches, irritability, joint pain, nausea, bloated feeling, dry mouth, and dizziness. On the other hand, if Reichard's own physicians failed to acknowledge side effects, it is not arbitrary and capricious for United of Omaha to follow suit. Moreover, Dr. Reeder's medical file review and United of Omaha's appeal decision letter explicitly address many of these symptoms, even if they do not label them as side effects. Whether Reichard's conditions or her medications cause these symptoms is immaterial to United of Omaha's determination, so long as it considers the impact of these symptoms on her ability to

perform all of the Material Duties of any Gainful Occupation.[18]  Ideally, Dr. Reeder or United of Omaha would have explicitly acknowledged Reichard's argument in her appeal letter that the adverse determination omitted a consideration of her side effects.  Nevertheless, this minor omission falls far short of an abuse of discretion given that Dr. Reeder considered the few documented side effects, and United of Omaha's appeal review addressed many of the same symptoms Reichard classifies as side effects.

c.      United of Omaha's Consideration of Reichard's SSDI Award

Reichard next argues that United of Omaha's adverse decision on appeal was arbitrary and capricious because it failed to consider her SSDI award.  Several hurdles complicate her argument: (1) any notice of the SSDI award that predates United of Omaha's appeal decision is outside of the administrative record; (2) assuming *arguendo* that consideration of that notice is proper, the notice was to the Advocator Group, not United of Omaha, requiring a finding that the latter had imputed knowledge; (3) some case law suggests that a plan administrator's failure to consider an SSD award is not an abuse of discretion; and (4) there is no evidence that United of Omaha had knowledge of the records and reasoning upon which the SSA reached a favorable decision.  The court discusses each hurdle in turn.

i.      Whether consideration of the award, outside of the administrative record, is proper

An inconsistency between a favorable SSA determination and an unfavorable plan administrator determination is not an abuse of discretion when the SSA award was not part of the administrative record when the administrator rendered its decision.  *See Pearson-Rhoads v. Aetna Life Ins. Co.*, No. CIV.A. 10-1076, 2011 WL 5116633, at *14 (E.D. Pa. Oct. 28, 2011).  Here, the only evidence of Reichard's SSDI award in the administrative record is a June 6, 2017

---

[18] Section III.B.1.d., *infra*, discusses whether United of Omaha did in fact consider the impact of many of these symptoms.

email from the Advocator Group to United of Omaha transmitting her award notice.  This postdates United of Omaha's May 2, 2017 appeal decision by more than a month, demonstrating that the award was not part of the administrative record when United of Omaha reached its appeal decision.  Therefore, Reichard must rely on evidence outside of the administrative record to further pursue her SSDI argument.

The only evidence of the SSDI award that predates United of Omaha's May 2, 2017 appeal decision is an April 12, 2017 letter from the Advocator Group to Reichard, stating, "As you are aware, we received notice that your [SSD] claim has been awarded.  If you have not received a favorable decision or award correspondence, please inform us immediately." Decl. of Reichard in Supp. of Mot. for Summ. J/Alternative Mot. for J. pursuant to Rule 52 at ECF pp. 1, 4.  Reichard has not explained why this evidence fits an exception to the general rule that a court limits its review to the administrative record, and the court agrees with United of Omaha that this evidence is not for the court's consideration.  Had discovery produced, for example, correspondence in which the Advocator Group notified United of Omaha of the SSDI award in April 2017, thereby disproving United of Omaha's claim of ignorance, that correspondence would constitute acceptable conflict evidence outside of the administrative record.  But because the only proper evidence of United of Omaha's knowledge of the SSDI award postdates its appeal decision, it did not abuse its discretion by failing to consider it.

ii.     Whether a finding that United of Omaha had implied knowledge of the award is proper

Even assuming that the Advocator Group's April 12, 2017 correspondence is proper evidence for review, this court cannot accept Reichard's theory as to how the law imputes the Advocator Group's knowledge of the award to United of Omaha.  Reichard argues:

> [T]he Advocator Group sent an overpayment collection letter on behalf of
> [United of Omaha] to Reichard on April 12, 2017.  The Advocator Group's

> knowledge of Reichard's SSDI award is imputed as a matter of law to [United of Omaha]. . . .
>
> . . . [A]s [United of Omaha's] agent to collect any possible overpayment as a result of an SSDI award, [t]he Advocator Group knew that Reichard had been awarded SSDI benefits no later than the date of its April 12, 2017[] letter, . . . and that knowledge was clearly material to its duties as [United of Omaha's] agent. Therefore, [United of Omaha], as principal, is charged with notice of the same facts as of April 12, 2017 . . . .

Pl.'s Br. at 15. Thus, she relies on agency law to impute knowledge to United of Omaha— knowledge of which there is otherwise no evidence either within or without the administrative record.

Reichard cites Third and Ninth Circuit cases for the accurate proposition that principles of federal agency common law may apply in ERISA cases. *See Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939–40 (9th Cir. 2017) (explaining that "[t]hese agency principles, which we adopt into the federal common law, further Congress's goals under ERISA by preventing insurers from evading their obligation to pay benefits"); *Taylor v. Peoples Nat. Gas Co.*, 49 F.3d 982, 988–89 (3d Cir. 1995) (concluding that "both elements necessary for the existence of apparent authority are present in this [ERISA] case"). The remaining cases she cites hold that an agent's knowledge is imputed to the principal if the knowledge is material to the agent's duties to the principal. *See Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 106–07 (3d Cir. 2009) (concluding that "an employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer in two circumstances[.]"); *F.T.C. v. Cephalon, Inc.*, 36 F. Supp. 3d 527, 535 (E.D. Pa. 2014) (determining that two individuals "who committed inequitable conduct during the patent prosecution were acting within the scope of their employment with [the company.] Therefore, [the company] . . . must be held to have had knowledge of its own misconduct"); *Schlier v. Rice*, 630 F. Supp. 2d 458, 469–70 (M.D. Pa. 2007) (concluding that client "must be charged with the legal consequences of having actual

knowledge" of certain facts when client's attorneys had knowledge of those facts). While this legal authority would be helpful if in fact a principal-agent relationship existed between United of Omaha and the Advocator Group, Reichard errs by presupposing that relationship. She fails to explain—factually or legally—why the court should also presuppose this relationship.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006); *see also Castle Cheese, Inc. v. MS Produce, Inc.*, No. CIV.A 04-878, 2008 WL 4372856, at *8 (W.D. Pa. Sept. 19, 2008) ("In order to establish the existence of an agency relationship, a party must show that: (1) there was a manifestation by the principal that the agent would act for it; (2) the agent accepted such an undertaking; and (3) the principal retained control of the endeavor." (citing *Tribune–Review Publ'g Co. v. Westmoreland Cty. Hous. Auth.*, 833 A.2d 112, 119–20 (Pa. 2003)). The "principal's right to control the actions of the agent is a hallmark of an agency relationship." *Id.* at *9; *see also Menichini v. Grant*, 995 F.2d 1224, 1233 n.14 (3d Cir. 1993) ("Agency law recognizes the principal's ability to control and monitor agent behavior . . . .").

Here, Reichard has not engaged in any of the factual questions embedded in the above surface-level agency inquiry. Even resolving questions of assent in Reichard's favor, the degree and nature of control and monitoring that United of Omaha asserted over the Advocator Group is unclear. The record only demonstrates email correspondence from the Advocator Group to United of Omaha updating it on the progress of Reichard's SSDI claim and a statement in the Policy that United of Omaha had partnered with three firms specializing in SSD. There is no evidence that United of Omaha directed the Advocator Group in its SSD advocacy. While

United of Omaha stood to benefit financially from the Advocator Group's representation of Reichard in that a SSDI award would offset LTD benefits, she has not explained how this fact alone creates an agency relationship.

Additionally, to the extent that Reichard agrees with United of Omaha's conclusion that the Advocator Group is an independent contractor, *see* United of Omaha's B. Opp. Pl.'s Mot. Summ. J./M. J. ("Def.'s Opp.") at 27, Doc. No. 45-1, the Advocator Group squarely falls into the non-agent variety of independent contractor:

> [A]n independent contractor is not necessarily an agent. A non-agent independent contractor is defined as a person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other. The distinction between a non-agent independent contractor and an agent independent contractor has been analogized as a firm that contracts to perform a particular, discrete task, such as to build a swimming pool, or to a party who is empowered to speak for another and bind the other in contracts.

*King's Choice Neckwear, Inc. v. Fedex Corp.*, Civil Action No. 07-CV-0275 (DMC), 2007 WL 4554220, at *5 (D.N.J. Dec. 21, 2007) (citations, quotations, and alterations omitted). Applying the *King's Choice Neckwear* reasoning to this case, United of Omaha appeared to merely contract with the Advocator Group to deliver an award to offset any LTD obligations by performing the particular, discrete task of representing Reichard before the SSA. There is no evidence that United of Omaha empowered the Advocator group to, for example, speak on its behalf or contractually bind it.

None of the cases Reichard cites is helpful on the threshold inquiry of whether an agency relationship exists here. In *Huston*, the alleged agency question involved whether two of the defendant's employees qualified as "management level" so that their knowledge could be imputed to the employer for Title VII liability purposes. *Id.* at 102. It is unclear how *Cephalon* is relevant; the agency analysis there again involved imputing knowledge of employees to the

defendant employer.  36 F. Supp. 3d at 535.  And the brief agency discussion in *Schlier* involved imputing an attorney's knowledge to a client.  It is not apparent to the court, and Reichard does not elucidate, how the relationship between United of Omaha and the Advocator Group is analogous to that between employer and employee or client and attorney.

Without Reichard presenting further legal and factual support, the court is unwilling to conclusorily find that an agency relationship existed, thereby imputing the Advocator Group's knowledge to United of Omaha.  Therefore, in addition to the Advocator Group's April 12, 2017 letter falling outside of proper evidentiary consideration, United of Omaha did not abuse its discretion by failing to consider Reichard's SSDI award because she failed to prove that agency law imputes knowledge of the award to it.

iii.     United of Omaha's obligation to consider a favorable award

Even if the court decided that agency law imputes the Advocator Group's knowledge of the SSDI award upon United of Omaha, it is not clear as a matter of law that a failure to consider the award alone constitutes an abuse of discretion.  In this regard, "[w]hile the award of [SSD] benefits may be a relevant factor in an administrator's decision, failure to consider this determination does not render the administrator's decision an abuse of discretion."  *Burk v. Broadspire Servs., Inc.*, 342 F. App'x 732, 738 (3d Cir. 2009) (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91–92 (2d Cir. 2009)); *but see Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 269 (3d Cir. 2006) ("The SSA's decision may be considered as a factor in evaluating whether a plan administrator has acted arbitrarily and capriciously in reviewing a plaintiff's claim.").  While the brevity of the *Burk* court's SSD analysis and the tension between the quoted passages of *Burk* and *Marciniak* give the court pause in solely relying upon *Burk* to reject Reichard's SSD argument, it at least casts doubt on the veracity of her argument that,

"[w]hile [United of Omaha] was not required to <u>agree</u> with the SSDI determination, it did not have the right to ignore it. [United of Omaha's] failure to consider Reichard's SSDI award was an abuse of discretion." Pl.'s Br. at 24 (emphasis in original).

iv.   The records and reasoning behind the award

Lastly, there is reason to doubt the relevance of Reichard's SSDI award based on the sparse SSDI record in this case, which does not include a decision by an administrative law judge, evidence of the record before the SSA, or any information other than the favorable outcome of her claim. A disagreement between a favorable SSD determination and an unfavorable LTD benefits determination "is relevant though not dispositive, particularly . . . when the administrator rejects the very diagnoses on which the Social Security benefits determination is based." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 167 (3d Cir. 2007). However, a plan administrator's denial of benefits is not arbitrary and capricious, SSD award notwithstanding, when there is evidence that the SSA based its determination on a distinguishable record. *See, e.g.*, *Goletz v. Prudential Ins. Co. of Am.*, 383 F. App'x 193, 198 (3d Cir. 2010) ("[T]here is no reason to view the SSA's contrary determination as evidence of an abuse of discretion given that the SSA considered evidence which was different than the evidence available to Prudential."); *Shatto v. Liberty Life Assurance Co. of Boston*, Civil Action No. 14-5653, 2016 WL 5374106, at *16 (E.D. Pa. Sept. 26, 2016) ("Defendant's final appeal denial letter noted that the SSA award had been considered, but that it had reached a different conclusion from the SSA, in part because Defendant had access to Plaintiff's more recent medical information, and in part because of the contents of the vocational report, items which were not presented to the SSA."); *Mann v. UNUM Life Ins. Co. of Am.*, No. CIV.A. 02-1346, 2003 WL 22917545, at *9 n.7 (E.D. Pa. Nov. 25, 2003) ("UNUM's record contained a number

of medical reports, testing, and surveillance which were not part of the Social Security record."). Thus, when the record before the SSA is incomparable to that before a LTD plan administrator, different outcomes on the question of disability are unremarkable.

The point in discussing these cases is not to suggest that the SSA and United of Omaha considered distinguishable records; rather, the record before the SSA is a mystery here defeating any attempt to compare the SSA's and United of Omaha's claims process. Consequently, the relevance of the mere outcome of SSA proceedings without the reasoning and records behind the outcome are of dubious utility to the administrator. Even if United of Omaha had imputed knowledge of the SSDI outcome, it is unclear how it could have put that outcome to use to materially change its adverse decision on appeal. In contrast, the cases above suggest that the plan administrators there had access to, for example, reasoned administrative law judge decisions and compiled medical records before the SSA, thereby providing insight into the SSA's process and reasoning. For the SSDI determination to materially alter United of Omaha's adverse appeal decision, United of Omaha would have had to relinquish its application of the known record here to its own disability standard in favor of the SSA's application of an unknown record to a different disability standard.

To be clear, the court agrees with Reichard's argument that a SSD award can be "highly significant" given that "the standard for disability applied by the [SSA] is at least as exacting as the standard under the Plan." *See Michaux v. Bayer Corp.*, Civil No. 05-1430 (JBS), 2006 WL 1843123, at *11 (D.N.J. June 30, 2006) (explaining that, *inter alia*, SSD disability definition requires inability to hold gainful employment at *any* job, and remanding plaintiff's claim back to plan administrator because it neglected to analyze favorable and concurrent SSD determination and administrative law judge decision). However, that significance is predicated upon an

administrator's awareness of the SSA's reasoning and records and an ability to evaluate, compare, and contrast the SSA's reasoning and records with that of the administrator.

In sum, Reichard's argument that United of Omaha abused its discretion by failing to consider her SSDI award fails for two independently sufficient reasons: evidence of the award that predates United of Omaha's appeal decision is outside of the administrative record, and the record before the court fails to establish an agency relationship between United of Omaha and the Advocator Group. The Third Circuit's holding in *Burk* and the lack of records or reasoning behind the SSA's favorable decision further counsel against holding that United of Omaha arbitrarily and capriciously failed to consider Reichard's SSDI award. The court is sympathetic to Reichard's undoubted frustration at this outcome: How is she not entitled to LTD benefits when concurrent SSA proceedings resulted in SSDI benefits under an arguably more exacting disability definition? Unfortunately, ERISA law generally limiting court review to the administrative record, agency law requiring a demonstration that United of Omaha exerted some degree of control over the Advocator Group, Third Circuit case law, and an absence of records and reasoning behind the SSA's determination require finding that United of Omaha did not abuse its discretion by finding her able to work without considering her SSDI award.

d.    Whether Substantial Evidence Supports United of Omaha Basing its Determination on its
Medical and Vocational Reviews and Examination

Reichard next argues that substantial evidence does not support Dr. Liebermann's medical peer review, Dr. Golombek's report following his IME, Palmer's TSA, or Dr. Reeder's medical file review. This section addresses the contentions related to each report in turn.

i.    Dr. Liebermann's medical peer review

Reichard alleges that Dr. Liebermann erred by failing to consider current records in his analysis and concluding that she had not had significant issues with Crohn's disease since

January 2012.  Pl.'s Br. at 25.  The current records argument appears to be as follows: United of Omaha retained Dr. Liebermann to answer questions relating to Reichard's gastrointestinal diagnoses and restrictions "for the timeframe of 07/01/2016 to 10/01/2016;" yet he admits to "having no gastrointestinal medical information as of July 2016 going forward."  *See* Pl.'s Opp. Def.'s Mot. Summ. J. ("Pl.'s Opp.") at 22; Admin. R. at 231–32, 346.  This argument is unpersuasive.  United of Omaha's questions to Dr. Liebermann were presumably an attempt at determining Reichard's up-to-date condition—*i.e.* as of the period from July to October of 2016, and Dr. Liebermann dated his report October 3, 2016.  There do not appear to be any gastrointestinal records for that period other than an unremarkable July 27, 2016 colonoscopy— and Reichard does not identify any omitted records.  Therefore, Dr. Liebermann reasonably synthesized prior records and inferred her condition for the three-month period requested.  *See* Admin. R. at 232 ("[T]he claimant has been stable with respect to Crohn's disease for months and therefore it is likely that she will remain in remission beyond July 2016, when my information stops.")  Moreover, Dr. Liebermann was open to amending his peer review with updated information for that time, which was ultimately unnecessary because of the absence of gastrointestinal treatment for that period.  *See* Admin. R. at 230 ("Although a flare is possible I reserve the opportunity to comment if the claimant has additional symptoms from the July to September 2016 time-frame if additional information is provided.").  Because no material records exist for that period, Dr. Liebermann's peer review was not unreasonable vis-à-vis the records considered.

In challenging Dr. Liebermann's conclusion that she had not had significant Crohn's issues since January 2012, Reichard references several records noting persistent gastrointestinal symptoms and treatment.  *See* Pl.'s Br. at 8–9 (noting, *inter alia*, increased Humira dosage from

September 25, 2014; possible presence of Crohn's disease in right colon on August 6, 2015; abdominal pain, diarrhea, nausea, vomiting, joint pain, inflammatory arthritis, and fecal incontinence as symptoms on February 8, 2016; and restarting of Methotrexate to help bowel and bladder issues on February 9, 2016). These records certainly demonstrate that Reichard had Crohn's issues since January 2012.

But various records from Reichard's own physicians suggest that Dr. Liebermann's conclusion that her issues were not "significant" was reasonable. Consider first the totality of records from Dr. Osterman, the lone gastrointestinal provider on file when Dr. Liebermann conducted his peer review. When Dr. Osterman submitted an APS on May 12, 2014, he expected Reichard to return to full-time work in just six months and indicated she could sit, stand, and walk for six to eight hours continuously. He reached this opinion despite noting many of the symptoms Reichard identifies above, as well as others—six bowel movements per day, occasional rectal prolapse, nausea, irregular bowel movements, abdominal pain, and unpredictable and episodic flare-ups—during the spring of 2014. In his final treatment notes in the administrative record, Dr. Osterman did not indicate that her conditions were worsening and largely noted the same symptoms. Given Dr. Osterman's functional expectations, a reasonable peer reviewer could conclude that Reichard's issues with Crohn's disease had not been significant since her bowel resection surgery in January 2012.

Even excluding Dr. Osterman's APS from consideration, the extent of Reichard's symptoms in his notes are unclear, providing leeway for Dr. Liebermann to conclude that her Crohn's issues were not significant. For example, Reichard experienced "some" incontinence, according to Dr. Osterman. The significance of this symptom depends on its severity, frequency, and impact on Reichard's daily functions, but Dr. Osterman left ambiguous these factors. Dr.

Liebermann was under no obligation to resolve these ambiguities in favor of a finding that her issues with Crohn's were significant. Given the lack of meaningful details pertaining to Crohn's symptoms and the deferential standard of review where the court may not substitute its own judgment for that of Dr. Liebermann's, his conclusion on the significance of her issues with Crohn's was reasonable.

Dr. Liebermann also states that he reviewed records from Dr. Chiappetta, which further support a finding that Reichard's Crohn's issues were not significant. Dr. Chiappetta noted in February 2014 that since Reichard's bowel resection surgery in January 2012, "her bowel symptoms have been relatively stable with intermittent bouts of diarrhea." By February 9, 2016, Dr. Chiappetta opined that Reichard was "doing well from my standpoint without any worsening symptoms," while noting continued bowel issues. Although Reichard is correct that her records also refer to changing medications and dosages for treatment of Crohn's, the possible presence of Crohn's in her colon, and the considerable list of symptoms associated with Crohn's detailed above, a reasonable peer reviewer could still conclude from this record that her gastrointestinal issues were not significant.

That said, Dr. Liebermann's review of Reichard's gastrointestinal records contained possible shortcomings. Most prominently, Dr. Liebermann states that Dr. Osterman commented on May 15, 2016, that Reichard's Crohn's disease was "stable," and she was not functionally impaired from a gastrointestinal standpoint. Dr. Liebermann then notes his agreement with those conclusions. The court could not find any record from Dr. Osterman dated May 15, 2016, or an opinion of his memorialized in other treatment records that Reichard's Crohn's was stable or that she was not functionally impaired from a gastrointestinal standpoint. Additionally, although Dr. Liebermann wrote that his review of the records contained a "special emphasis on the

gastrointestinal aspects," he omitted some of the symptoms and treatments relating to Crohn's identified above.

Substantial evidence still supports Dr. Liebermann's gastrointestinal analysis for the following four reasons: First, although Reichard states in her LTD appeal letter that she did not see Dr. Osterman on May 15, 2016, she does not appear to be pursuing the argument in this litigation that Dr. Osterman never referred to her Crohn's as "stable." And even in her appeal letter, she only challenged that specific date rather than Dr. Liebermann's assertion that Dr. Osterman concluded that her Crohn's was stable. Without a challenge from Reichard in this litigation, the court hesitates to conclude that Dr. Osterman never reached these conclusions, whether on May 15, 2016, or at any other time.[19] Second, even if Dr. Osterman never commented that Reichard was not functionally impaired from a gastrointestinal standpoint, his May 2014 APS nevertheless implies the same conclusion. As discussed above, concluding that Reichard could sit, stand, and walk for six to eight hours continuously each is incompatible with a determination that any of Reichard's gastrointestinal symptoms would functionally impair her. For example, if Dr. Osterman believed she could sit for six to eight hours continuously, he could not also believe that her rectal prolapse, fecal incontinence, diarrhea, or relatively large number of bowel movements in a day would materially interfere with that task.

Third, Dr. Chiappetta used the word "stable" to describe Reichard's bowel symptoms in 2014 and noted she was doing well without any worsening symptoms. While Dr. Chiappetta noted inflammatory bowel issues in 2015 and 2016, after the "stable" comment, her discussions do not suggest that Reichard's gastrointestinal condition had deteriorated since 2014. Therefore, even if Dr. Osterman never reached a conclusion that Reichard's Crohn's was stable, her primary

---

[19] This is especially true given that Reichard's primary attack on Dr. Golombek's IME is that he cited to nonexistent records.

care physician did, similarly supporting Dr. Liebermann's conclusion. Finally, even though Dr. Liebermann does not appear to have considered all of Reichard's gastrointestinal symptoms and medications, he wrote that "a flare is possible;" acknowledged her Crohn's diagnosis, inflammatory bowel disease, and her occasional bouts of abdominal pain and diarrhea; and noted that she maintained normal weight and nutritional status. His admission that a flare is possible suggests that he contemplated the possibility of future gastrointestinal symptoms and weighed them against his understanding of the frequency of her flare-ups as noted in the record. After weighing these factors, he concluded that her issues with Crohn's were not significant, and she was not functionally impaired from a gastrointestinal standpoint. In all, while the shortcomings noted above demonstrate that Dr. Liebermann's peer review was imperfect in its detail and breadth, substantial evidence nevertheless supports his conclusions.

### ii.  Dr. Golombek's IME report

Reichard argues that substantial evidence does not support Dr. Golombek's IME report because he: (1) only spent 20 minutes examining her, (2) cites records of doctors she did not see, (3) fails to address her medication side effects, (4) fails to explain why he disagrees with her doctors who say she cannot work, and (5) otherwise failed to explain his conclusion as to her capacity to work full time. *See* Pl.'s Br. at 25–26. The court disagrees on each point.

First, a 20-minute examination does not immediately strike the court as deficient, and regardless, Reichard does not detail how more time would have improved the examination. Her second assertion has no relevance to the medical integrity of Dr. Golombek's report: his references to "Dr. Mark Listerman," "Dr. Ravenelle," and "Ms. Almer" are typographical errors, referring to Dr. Osterman, Nurse Practitioner Ravenelle, and Palmer. The context in which Dr. Golombek refers to each could not make this more obvious. Third, the court already considered

Reichard's side effects argument and, regardless, Dr. Golombek thoroughly addressed her medication regimen in a two-paragraph section of his report. Fourth, the only doctor who said that Reichard could not work once she was on LTD benefits was Dr. Chiappetta.[20] Reichard is correct that Dr. Golombek did not explicitly explain the reasoning behind his disagreement with Dr. Chiappetta. However, Dr. Golombek wrote that he agreed with Dr. Chiappetta's assigned sitting, standing, and walking restrictions, which supported sedentary work and undermined her February 2, 2016 opinion that Reichard could not work. Moreover, because Dr. Chiappetta simply wrote "no work" where the February 2, 2016 APS form requested her opinion on specific functional restrictions, and her APS was otherwise compatible with at least sedentary work, it is difficult to imagine how Dr. Golombek could have meaningfully engaged her "no work" conclusion. Fifth, because Reichard does not identify any other specific shortcomings in Dr. Golombek's determination that she could work full time, she has failed to demonstrate that substantial evidence does not support his IME report.

### iii. Palmer's TSA

Turning to Palmer's TSA, Reichard argues that it improperly preceded Drs. Liebermann's, Golombek's, and Reeder's reviews; Palmer did not consider the intellectual demands of the jobs he proposed; he did not consider the side effects of her medications; and he did not consider her SSDI award. *See* Pl.'s Br. at 29–31. She does not identify any erroneous findings or omissions that would suggest a problem with issuing the vocational report prior to those doctors' reviews. She also fails to specify any intellectual demands of the jobs Palmer identified—office nurse, school nurse, medical insurance clerk, hospital-admitting clerk, and administrative clerk—that are beyond her. The court has already addressed her side effects and SSDI arguments.

---

[20] Recall that Dr. Osterman expected Reichard to return to work within six months.

Reichard also quotes at length from the Third Circuit opinion in *Havens v. Continental Casualty Co.*, 186 F. App'x 207 (2006). There, the court commented on the importance of a vocational analysis to a claimant's work capacity and the minimum standards the analysis must meet to pass arbitrary and capricious review:

> The finding that [the claimant] was capable of performing alternate occupations was arbitrary and capricious. The irreducible logical core of such a finding is that a claimant has a residual functional capacity that equals or exceeds the functional requirements of a feasible alternate occupation. These two determinations—the claimant's capacity and the occupation's requirements—must together be detailed enough to make rational comparison possible. Otherwise, the "finding" that the claimant can perform alternate occupations consists only of a bald assertion.

186 F. App'x at 212. The court went on to explain that the administrator in that case abused its discretion by failing to make reasonable determinations on both the claimant's capacity and the occupation's requirements. *Id.* at 213. As to the occupation's requirements, the record was silent as to the physical requirements of the proposed alternative occupation or the methodology by which the vocational expert selected the occupations:

> The expert's report simply listed a few general factors considered and then named the three occupations. [The administrator] may reasonably rely on its vocational experts to help it identify alternate occupations, but it is not rational to defer to such experts in the absence of a threshold indication that their conclusions, in the words of Federal Rule of Evidence 702, are the product of "reliable principles and methods ... applied ... reliably to the facts of the case."

*Id.* at 213.

Here, Palmer's TSA conforms to the Third Circuit's standards. His report adopts the restrictions and limitations noted in Nurse Grancer's review, and for each job he identifies, he provides a DOT code corresponding to a description of duties, an exertional level, and a monthly wage. For example, the DOT code for the medical insurance clerk position contains a job description detailing tasks relating to hospitalization insurance coverage verification and itemized hospital bill compilation, none of which appear to conflict with Reichard's abilities.

Nor has Reichard specified any aspects of the positions Palmer identified that conflict with her abilities. The court notes one error in Palmer's analysis: The monthly wage for one of the positions, hospital-admitting clerk, is below the Policy's disability definition threshold (sixty percent of her pre-disability wage). However, the four remaining jobs are above the threshold wage, leaving Palmer's overall conclusion as to employment options intact.

### iv. Dr. Reeder's Medical File Review

Reichard next argues that substantial evidence does not support Dr. Reeder's medical file review because he: (1) relied upon the purportedly erroneous reviews by Drs. Liebermann and Golombek; (2) failed to wait for forthcoming medical records before submitting his review; and (3) is unqualified because he is not a rheumatologist or gastroenterologist. The court disagrees on each.

First, as discussed above, Reichard has not demonstrated that the reports of Drs. Liebermann and Golombek were erroneous. While Dr. Reeder considers the possibly erroneous reference to Dr. Osterman's May 15, 2016 conclusion that Reichard's Crohn's was stable, he does not appear to rely on Dr. Osterman's conclusion to a greater extent than Dr. Liebermann. Because substantial evidence supports Dr. Liebermann's gastrointestinal conclusions regardless of his inclusion of Dr. Osterman's possibly nonexistent comment, substantial evidence also supports Dr. Reeder's adoption of Dr. Liebermann's conclusions of no gastrointestinal restrictions or limitations.

Even assuming *arguendo* that substantial evidence does not support the reports of Drs. Liebermann and Golombek, Dr. Reeder provides his own independently sufficient reasoning for finding no gastrointestinal or rheumatological restrictions. Considering first Dr. Reeder's gastrointestinal discussion, he accepts Dr. Osterman's opinion that she could sit, stand, and walk

for six to eight hours.[21]  He also reasoned, similar to the court's analysis in finding that substantial evidence supported Dr. Liebermann's peer review, that, "While the insured claims that her current disability in part is related to incontinence of rectal prolapse, she had had these symptoms prior to the date of disability."  Admin. R. at 300.  This assertion is on point: If Reichard could work as a registered nurse, a job of medium exertion, prior to her disability, and she experienced rectal prolapse and incontinence while working that job, and there is no evidence that these symptoms materially worsened, why can she not now perform a sedentary or light job?  Dr. Reeder also considered updated records from Dr. Blanco, demonstrating that her bowel movements had halved to five per day since her February 2016 visit with Dr. Osterman.  He notes that, while Dr. Blanco referred her to a rectal surgeon to consider treatment for rectal prolapse, the record did not suggest that that surgery would impose ongoing work restrictions.

Ideally, Dr. Reeder would have engaged in a more extended discussion of some of the implications of her Crohn's symptoms on her ability to perform sedentary or light work—*e.g.* the impact of her rectal prolapse, fecal incontinence, or large number of bowel movements on working, say, a desk job.  However, this shortcoming is minor given his reasonable explanation above that she previously worked a more rigorous job with prolapse and incontinence, conclusion that there is no evidence that surgical treatment of her rectal prolapse would be disabling, and opinion in his letter to Dr. Blanco that "she would ordinarily have free access to toilet facilities wherever she worked."  Thus, Dr. Reeder reached his own conclusion supported

---

[21] In her opposition brief, Reichard argues that United of Omaha erred by failing to solicit more APSs.  *See* Pl.'s Opp. at 13, 20.  The implication is that the existing APSs became outdated at some point.  The court disagrees because, as described throughout Section III.B.1.d., there is little evidence of material changes in her conditions that would render any of the APSs outdated.  Moreover, as United of Omaha argues in its reply, it is her burden, not United of Omaha's to submit records in support of her claim.  *See* Def.'s Reply Br. in Further Supp. of its Mot. for Summ. J. at 8 (citing *Hoch v. Hartford Life & Acc. Ins. Co.*, Civil Action No. 08-4805, 2009 WL 1162823, at *16 (E.D. Pa. Apr. 29, 2009) ("The burden to supply all documents [the plaintiff] wished to be considered as part of her claim on appeal rested entirely with [her]—not with [the defendant].")).

by substantial evidence that Reichard was not subject to gastrointestinal restrictions or limitations, independent of his reliance on Dr. Liebermann's conclusion.

The court also notes that any shortcomings in Dr. Reeder's (or Dr. Liebermann's) discussion of Crohn's symptoms are even less consequential when recalling the restrictions Palmer considered in his TSA. Because Palmer adopted Nurse Grancer's restrictions—including the ability to reposition as needed for five to ten minutes every one to two hours—and these restrictions contemplate frequent trips to the bathroom, the Gainful Occupations that Palmer identified account for the workday impacts of her Crohn's symptoms. In other words, United of Omaha could reasonably determine that Reichard's gastrointestinal symptoms did not functionally impair her because its vocational expert found jobs at which she could take frequent bathroom breaks.

Turning to his conclusion that Reichard suffered no rheumatological restrictions or limitations, Dr. Reeder went beyond merely rubber-stamping Dr. Golombek's report. Similar to the court's confusion over Dr. Chiappetta's "no work" opinion, he found that Dr. Chiappetta's office notes and claims of impairment were "internally inconsistent." This is a reasonable conclusion: On the one hand, the restrictions Dr. Chiappetta imposed on February 2, 2016, and the "essentially normal findings" from 2014 and 2015 appointments, are compatible with sedentary and light work. On the other, Dr. Chiappetta wrote "no work" on that same date she imposed restrictions compatible with sedentary and light work. Dr. Reeder continues to address her fibromyalgia in his Conclusion section of the medical file review, explaining that she does not take pain medications in significant quantities, and there is no evidence of loss of function from the condition based on muscle testing, range of motion, strength, and gait documented across providers. Therefore, because Dr. Reeder provides sufficient reasons for his disagreement

with Dr. Chiappetta, his rheumatological conclusions are not "procedural anomalies that call into question the fairness of the process [by] relying on the opinions of non-treating over treating physicians without reason." *Morgan*, 755 F. Supp. 2d at 643. In sum, even if Dr. Golombek's report was erroneous, substantial evidence would still support Dr. Reeder's rheumatological conclusion.

Reichard's second complaint against Dr. Reeder's medical file review, that he completed it knowing that more treatment records were forthcoming, is of her own doing. Roughly three weeks before Dr. Reeder issued his review, Reichard emailed United of Omaha attaching records and stating, "This is the last of the medical record[s] as of now, so please su[b]mit my appeal. There are two physicians . . . that I have appointments for, but no current[] medical records for." Admin. R. at 320. Thus, as United of Omaha argues, Reichard "herself explicitly requested that her appeal be considered . . . *without* the records she now suggests that United of Omaha should have obtained." Def.'s Opp. at 15 (emphasis in original). Moreover, accepting this argument would promote poor policy: Because a claimant is likely to always have future appointments scheduled, Reichard's position here would effectively block an administrator from ever reaching a final claim determination. *See also Swanberg v. PNC Fin. Servs. Grp., Inc.*, No. CV 2:15-544, 2016 WL 4493684, at *10 (W.D. Pa. Aug. 26, 2016) ("Contrary to [the plaintiff's] allegations, [the administrator] did not turn a 'blind eye' to Dr. Franzen's report; it simply arrived too late for [the administrator] to consider it in making its final determination."). Therefore, even if Reichard herself was not responsible for Dr. Reeder proceeding before receiving forthcoming treatment records, her argument would fail.

Third, Reichard's own critique of Dr. Reeder's analysis belies her argument that he was unqualified to review her appeal because he was not a rheumatologist or gastroenterologist. In

the same paragraph that she challenges his qualifications, she acknowledges the importance of a reviewer "evaluat[ing] all of her conditions in a holistic fashion." Pl.'s Br. at 28. Holistic evaluation appears to be precisely the use of Dr. Reeder as a generalist, board-certified in internal medicine. Reichard's argument falls flatter given that United of Omaha had already sought out physicians in both specialties, Dr. Liebermann and Dr. Golombek. In her brief in opposition to United of Omaha's motion, Reichard also presents a new argument: that Dr. Reeder's reference to a rheumatoid arthritis diagnosis, which is similar but distinct from her true diagnosis of inflammatory bowel disease arthritis, is erroneous, further demonstrating his lack of qualifications. *See* Pl.'s Opp. at 14–20. However, as Reichard herself admits, her own doctors document this diagnosis, *see* Admin. R. at 497, 504, and regardless, she fails to establish how the differences between the two diagnoses, which she admits are similar, would impact her ability to work. In all, Reichard has failed to demonstrate that substantial evidence does not support Dr. Reeder's medical file review.

### e.    Conflict of Interest Posed by Dr. Reeder's Review

While related to her argument that substantial evidence does not support Dr. Reeder's medical file review, Reichard's argument here is distinct: She alleges that United of Omaha's use of Dr. Reeder demonstrates a lack of fiduciary neutrality and a procedural conflict of interest, a factor weighing towards United of Omaha abusing its discretion. *See* Pl.'s Br. at 9–13, 31–33.[22] Specifically, she urges the court to follow other cases that have questioned Dr. Reeder's credibility, and points to his letters to physicians and unfavorable selectivity of considered records as evidence of bias. There is some merit to her arguments, and the court accordingly

---

[22] It appears that while Reichard has asserted a procedural conflict of interest, she does not assert a structural conflict of interest despite the possibility that one may exist; at oral argument on Reichard's motion to compel earlier in this litigation, United of Omaha acknowledged that it is both the insurer and decision-maker for the Plan. Had Reichard asserted this structural conflict, and the court weighed it as a factor, it would not have altered the court's resolution of the cross-motions for summary judgment.

takes into account the procedural conflict of interest and weighs it as a factor against a finding that United of Omaha did not abuse its discretion.

Reichard primarily relies on three cases for the proposition that United of Omaha's use of Dr. Reeder demonstrates a lack of fiduciary neutrality. The first is inapposite because the court never reached the issue of Dr. Reeder's opinion, and Reichard misleadingly quotes the court's summary of the plaintiff's arguments for support. *See Ferguson v. United of Omaha Life Ins. Co.*, 3 F. Supp. 3d 474, 479 (D. Md. 2014). In the second, the court gave little weight to Dr. Reeder's opinion and questioned his credibility and fairness because he stood "alone in opining that no objective evidence exists to support the medical diagnoses," ignored objective evidence in the record favorable to the claimant, and disagreed with examining specialists despite no demonstrated expertise in those specialties. *See Williams v. United of Omaha Life Ins. Co.*, No. CV-11-BE-3948-S, 2013 WL 5519525, at *14 (N.D. Ala. Sept. 30, 2013). In the third, the court criticized Dr. Reeder's review because he ignored objective evidence (*e.g.*, an MRI) and a fibromyalgia diagnosis, he self-servingly chose which records to rely upon, and he reached his conclusion without the benefit of an IME. *See Tassone v. United of Omaha Life Ins. Co.*, 264 F. Supp. 3d 867, 875–76 (N.D. Ill. 2017) ("'The report of a non-examining, non-treating physician should be discounted when contradicted by all other evidence in the record.'" (quoting *Wilkes v. Unum Life Ins. Co. of Am.*, No. 01-C-182-C, 2002 WL 926279, at *8 (W.D. Wis. Jan. 29, 2002))).

*Williams* and *Tassone* are distinguishable. Unlike those cases, the court cannot find an example of omitted objective evidence or an ignored diagnosis in Dr. Reeder's medical file review, and Reichard does not present an example. Nor is he alone in opining that her diagnoses lack objective evidence, as in *Williams*. He also reached his conclusions with the benefit of Dr.

Golombek's IME, unlike his review in *Tassone*. His summary of the administrative record is thorough, and there are no apparent examples of him ignoring evidence. While Dr. Reeder disagreed with Dr. Chiappetta as to Reichard's work ability, similar to his disagreement with examining specialists in *Williams*, he sufficiently justified his disagreement, as discussed above. His review has imperfections, all discussed above: his failure to make clear that he was responding to arguments in Reichard's appeal letter such as the impact of her medication side effects, incorporation of the possible phantom May 15, 2016 comment from Dr. Osterman that Reichard's Crohn's was stable, and under-discussion of Reichard's Crohn's symptoms. Still, these blemishes are insufficient to conclude that Dr. Reeder's review is entitled to little weight or representative of a procedural conflict.

His letters to Reichard's physicians are a different matter. Preliminarily, the court agrees with United of Omaha's argument that "seeking Plaintiff's doctors' input prior to a final claim determination is a prudent practice that ensures a reasoned, informed claim-determination process . . . ." Def.'s Opp. at 32. But the court also agrees with the *Tassone's* commentary on Dr. Reeder's letters:

> The letters were obviously written in a manner designed to lure the recipient into either agreeing with Dr. Reeder's limited and biased review of the records, or enter into a war of diagnoses with him. There is no upside for any doctor to engage in a dispute with an in-house physician. Thus, the court places no significance on the doctors' silence to such a biased letter.

264 F. Supp. 3d at 875. The problem with Dr. Reeder's letters to Reichard's physicians has nothing to do with his attempt at corresponding with them to seek their viewpoints. For example, Dr. Jiminez signing Dr. Reeder's letter is strong evidence that Reichard's own physician does not consider her headaches disabling. The problem is that Dr. Reeder wrote, "[I]f I do not hear from you within 10 days of the receipt of this information, I will assume that you

are in agreement with the content of this letter." Admin. R. at 228, 245, 275, 280. Treatment of a physician's silence as agreement smacks of bias and stains Dr. Reeder's credibility; accordingly, the court considers this aspect of his letters as a procedural conflict of interest and a factor weighing in favor of United of Omaha arbitrarily and capriciously denying Reichard's appeal. However, the factor is minor given that United of Omaha does not appear to rely on any physicians' silence as agreement with Dr. Reeder in its May 2, 2017 denial letter.

f. <u>Whether United of Omaha Disregarded Reichard's Complaints of Pain and Fatigue</u>

The entirety of Reichard's pain and fatigue argument is a brief description of a recent Third Circuit case, *Killebrew v. Prudential Ins. Co. of Am.*, 723 F. App'x 133, 136 (3d Cir. 2018). There, the court reversed the district court's grant of the defendant's summary judgment motion and held that substantial evidence did not support the defendant's conclusion that "no evidence" existed to back the plaintiff's complaints of pain and fatigue. Although the plaintiff's physicians neither referred her to pain management nor prescribed her narcotic pain medication, she took multiple chronic pain medications, belying the defendant's claim of "no evidence." Reichard does not apply *Killebrew* to the facts of her own case, and there is no apparent example of United of Omaha finding no evidence of pain or fatigue in either Dr. Reeder's review or United of Omaha's denial letter. In fact, Dr. Reeder explicitly references her pain medications in the Conclusion section of his medical file review, finding that she took them in insufficient quantities to demonstrate any loss of function. Accordingly, Reichard fails to establish that United of Omaha abused its discretion by disregarding her complaints of pain and fatigue.

g. <u>The Cumulative Effect of Alleged Procedural Irregularities</u>

Reichard's argument here consists of conclusory allegations of United of Omaha turning a blind eye to the faults of its consultants' opinions and cherry-picking medical evidence, case

illustrations in which courts held that United of Omaha abused its discretion without an application to the case at hand, and a brief summary of prior arguments. To the extent that Reichard is arguing here that the court should weigh United of Omaha's history of biased claims administration as a procedural conflict of interest factor, *see Dowling*, 871 F.3d at 250, the court declines the invitation. Reichard herself cites a host of cases holding that United of Omaha did not abuse its discretion in denying benefits. *See* Pl.'s Br. at 26–27 (listing cases for proposition that United of Omaha routinely uses Dr. Reeder to deny applications, terminate claims, and deny appeals).

In all, Reichard has failed to persuade the court that United of Omaha's errors, singularly or cumulatively, demonstrate that it arbitrarily and capriciously denied her LTD benefit claim. There were shortcomings in the substance and process of the adjudication of her LTD benefit claim: Dr. Liebermann's reference to the possibly nonexistent May 15, 2016 Dr. Osterman comment and overly brief discussion of Crohn's symptoms; Palmer's reference to an occupation with a wage below the Policy threshold; and Dr. Reeder's failure to explicitly respond to Reichard's side effects argument in her appeal letter,[23] incorporation of Dr. Liebermann's reference to the possibly nonexistent "stable" comment by Dr. Osterman, and biased interpretation of physicians' silence as agreement. But the sum of these shortcomings—some of which Reichard herself failed to identify or argue in this litigation—do not establish that United of Omaha's LTD benefit denial was arbitrary and capricious.[24]

---

[23] Reichard argues more generally that Dr. Reeder failed to respond to arguments she raised in her appeal letter. *See* Pl.'s Br. at 2. However, as explained in the discussion of the impact of the side effects from her medications, United of Omaha did not abuse its discretion by failing to cite specific complaints in her appeal letter because, by and large, it implicitly addressed her concerns. For example, she suggested that she did not receive records from Dr. Osterman in the review file and that United of Omaha omitted records from Dr. Luchetti. Dr. Reeder addresses these concerns by summarizing all of Dr. Osterman's and Dr. Luchetti's records.

[24] Although Reichard's brief appears to lack any substantive argument that United of Omaha failed to consider her neurological or knee conditions, the court wishes to briefly address these issues in the interest of thoroughness. In short, the court is satisfied that United of Omaha did not abuse its discretion in its consideration of these issues given

## 2. Reichard's Alternative Motion for Judgment pursuant to Federal Rule of Civil Procedure 52

Reichard supports her alternative motion with just two sentences:

> Since evidence outside the Administrative Record is being offered on [United of Omaha's] conflict of interest, Plaintiff alternatively moves for judgment under Rule 52 because summary judgment may not be appropriate. If the material facts of the evidence outside the Administrative Record are disputed and there is a genuine issue of material fact on these issues, summary judgment is *not* proper because the Court for summary judgment purposes must construe such evidence in favor of the non-moving party.

Pl.'s Br. at 13–14 (citations omitted). She does not explain the standard of review under Rule 52 or how Rule 52 better enables this court to review evidence outside the record. Accordingly, the court denies her alternative motion.

## 3. United of Omaha's Motion for Summary Judgment

In essence, United of Omaha's motion for summary judgment is the converse of Reichard's motion insofar as United of Omaha claims that the court should grant summary judgment in its favor because there are no genuine issues of material fact and it did not act arbitrarily and capriciously in denying Reichard's LTD benefits claim. In addressing all of the arguments raised by Reichard in her motion, the court has addressed the issues raised by United of Omaha in its motion. United of Omaha has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law on the issue of whether it acted in an arbitrary and capricious manner when it denied Reichard's LTD benefits claim.

## IV. CONCLUSION

The court's review of the administrative record in this case shows that there are no genuine issues of material fact that would preclude the entry of summary judgment in this case.

---

that: (1) Dr. Jiminez agreed with Dr. Reeder's opinion that there is no evidence of neurological deficits that would result in work restrictions; and (2) Reichard admits that her knee condition improved since originally filing for STD and LTD benefits. *See* Pl.'s Opp. at 12 ("Her left knee condition improved because she had knee replacement surgery.")

More specifically, there are no genuine issues of material fact that would preclude the court from determining that Reichard has not met her burden to establish that United of Omaha's denial of LTD benefits under the Policy was arbitrary and capricious. That is, Reichard has not demonstrated that United of Omaha's failure to follow a claims manual, lack of consideration of medication side effects, failure to address her SSDI award, medical and vocational examinations and reviews, procedural conflict of interest, and lack of consideration of pain and headaches cumulatively show that United of Omaha abused its discretion. Under the arbitrary and capricious standard of review, the court cannot substitute its own judgment for that of United of Omaha and does not find that United of Omaha's LTD benefits denial was without reason, unsupported by substantial evidence, or erroneous as a matter of law. Accordingly, the court will deny Reichard's motion for summary judgment and alternative motion under Rule 52 and grant United of Omaha's motion for summary judgment.

A separate order follows.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.